**NATIONAL LABOR RELATIONS BOARD v. MOSS PLANING MILL CO.**

No. 6605.

United States Court of Appeals, Fourth Circuit.

Argued June 18, 1953.

Decided July 24, 1953.

John E. Jay, Attorney, N.L.R.B., Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Assoc. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Frederick U. Reel, Atty., N.L.R.B., Washington, D. C., on brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C., and John A. Wilkinson, Washington, N. C. (Rodman & Rodman, Washington, N. C., and Pierce & Blakeney, Charlotte, N. C., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition to enforce an order of the National Labor Relations Board which found the Moss Planing Company of Washington, N. C., guilty of violating sections 8(a)(1) and (3) of the National Labor Relations Act as amended, 29 U.S.C.A. §§ 151 et seq., and ordered it to cease and desist from further violations and to restore with back pay two employees, Fulcher and Wynne, found to have been discriminatorily discharged. The case centers around the discharge of these two employees. The company had been guilty of anti-union threats and intimidation at the time of an organizational campaign and the holding of a representation election, but this had occurred more than six months prior to the filing of the complaint herein and is relied on only as circumstantial evidence bearing upon the discharges of Fulcher and Wynne, which furnish the basis of the Board's order.

█ The facts are fully set forth in the decision of the Board and the intermediate report of the trial examiner and need not be repeated here at any great length. There is evidence that the management of the company was strongly opposed to the union and was much displeased at the result of the representation election. Fulcher had a record of long and faithful service with the company and had helped it fight the unionization on the occasion of a prior attempt to unionize the plant in 1948. In 1950 he and Wynne were active in the organization of the union and after its organization he was the union steward who represented the interests of the men in their day to day work and dealings with the company. There is a direct conflict in the evidence as to his attitude towards his work and as to the company's treatment of him following the organization of the union and as to the circumstances attending his discharge. On the one hand, there is substantial evidence, accepted by the Board, to the effect that, following the election, the company treated him with harshness, discriminated against him in the allotment of work and discharged him without adequate cause and under circumstances warranting the conclusion that it did so because of his union leadership and activities. On the part of the company, there is evidence that following the election, he became contentious, unruly and difficult to get along with and that the company put up with him as long as it could and finally discharged him for disobedience of orders. The question presented is a pure question of fact and we cannot say that the Board's conclusion is not supported by substantial evidence on the record considered as a whole. The evidence supporting the Board's finding is well summarized in the following extract from the intermediate report of the trial examiner:

"It is of course fundamental that an employer may discharge an employee for any reason, good or bad or for no reason at all, without violating the Act, so long as the reason is not premised on anti-union motivations. But, I am satisfied that the reasons advanced by respondent for discharging Fulcher do not stand up under scrutiny and that the real reason was its opposition to his known union activities. In arriving at this conclusion, I have in mind, by way of background and context, such considerations as Fulcher's long and satisfactory years of employment with the employer; his outstanding leadership and prominence in the organization and activities of the union; the fact of respondent urging him to assist in the defeat of the union and his failure to do so; its warnings of economic reprisals if the union succeeded in its

organizational campaign; its promise of continuance of its personal-loan policy, gifts of clothing, payment of bonuses, and help in getting out of trouble, if employees gave up their interest in the union and its threats of discontinuing these benefits and favors if they did not; its requests of employees to vote against the union; its questioning of employees with respect to their union sympathies and how they were going to vote; and, its statements that the union was going to get Fulcher into trouble and that if it could prevent him from getting a job anywhere, it would. When the entire sequence of events is considered in connection with the insubstantial nature of the proffered reasons for the discharge of Fulcher, upon whose leadership and influence in the employee community it had hoped to depend in 1950 as it did depend in 1948 to defeat the organizational effort, it is clear that those reasons were used as pretexts to obscure the fact that his discharge was effected because of respondent's disappointment concerning, and in retaliation for, his engagement in union activities including his carrying out his duties as job steward of the union. Equally clear is the fact that Fulcher did not become intolerable to respondent until he began to play his leading part in the affairs of the union."

█ With respect to Wynne, the Board found upon substantial evidence that his discharge was because of "his union and concerted activity" in prosecuting a wage claim against the company under the wage and hour law. The evidence with respect to this was that, following the selection of the union as bargaining agent for the employees, Wynne and one Speare, another employee, sought the aid of the union in presenting claims against the company under the wage and hour law. They were awarded substantial amounts on their claims, and the superintendent of the company became very angry on that account and was heard to remark "This damned union caused us to pay all this back pay".

The superintendent sought to induce Wynne, who had been awarded $700, to take $100 in settlement of the award, but Wynne refused although Speare accepted $125 in settlement of the award he had received. The superintendent went next morning to the boiler room where Wynne was at work and again brought up the subject of settlement and, when Wynne stated that he would take what the government officer had awarded him, the superintendent kicked him in the groin inflicting an injury of serious character requiring hospitalization. While Wynne was in the hospital as a result of the injury the superintendent sent word to him that he was discharged. The superintendent, a former amateur athlete weighing 165 pounds, testified that he kicked Wynne, a small one legged Negro, in self defense, but the Board did not accept that version of the matter and the version which it did accept is unquestionably supported by substantial evidence on the whole record. What we have, then, is a discharge because of the activity of Wynne in cooperation with the union in obtaining a back pay order and insisting that it be honored by the company. The fact that the superintendent gave him a cruel kick in addition to discharging him does not purge the discharge of its unlawful quality.

█ It is made an unfair labor practice by the Labor Management Relations Act to interfere with, restrain or coerce employees in the exercise of rights guaranteed by the Act, 29 U.S.C.A. § 158(1); and, by the Act, employees are guaranteed the right, not only to form, join or assist labor organizations and to bargain collectively through representatives of their own choosing, but also "to engage in other concerted activities for the purpose of collective bargaining *or other mutual aid or protection*". (Italics supplied.) 29 U.S.C.A. § 157. The giving of aid by a labor union to an employee in prosecution of a claim for back wages is clearly a concerted activity on the part of employees protected by the act; and to discharge the employee because he has invoked and participated in such activity and is insisting upon the payment of the award thereby obtained is just as clearly an

unfair labor practice which the Board is given power to redress. The matter was well put in the intermediate report of the trial examiner, where he said:

"We are not dealing here, as respondent contends, with an employer-employee argument and assault arising from a dispute unconnected with the employment relationship nor are we considering incidents unassociated with the terms and conditions of such relationship. Rather are we concerned in this phase of the case with occurrences that directly relate to a concerted activity the purpose of which was to furnish mutual aid and protection to respondent's employees. Manifestly, the activity of the union's state officials and its plant steward in behalf of Speare and Wynne and their activities in their own behalf, in seeking to procure wages to which they were proven to have been entitled, was a protected concerted activity in regard to employee's tenure of employment or terms and conditions of employment. Any doubt as to whether respondent recognized this activity as a concerted union movement is dispelled by Litchfield's undenied statement that the union was responsible for respondent being required to make the back payments. The quarrel over results for which the union was responsible was a dispute in regard to the terms and conditions of employment. The assault was the result of the union's achievement in Wynne's behalf. Wynne was discharged because of the dispute and accompanying assault arising out of his having engaged in concerted activities with the union and other employees of respondent for the purposes of mutual aid or protection. The Act is violated where a discharge is motivated by such activity."

In Joanna Cotton Mills Co. v. N.L.R.B., 4 Cir., 176 F.2d 749, 752, in holding that the circulation of a petition for an improper purpose did not come within the protection of the act, we pointed out that the act protected activities of employees entered into for mutual aid or protection even though no union activity was involved or collective bargaining contemplated. We said:

"We agree that the 'concerted activities' protected by the act are not limited to cases where the employees are acting through unions or are otherwise formally organized. It is sufficient that they are acting together for mutual aid or protection. See N.L.R.B. v. Peter Cailler Kohler Swiss Chocolates Co., Inc., 2 Cir., 130 F.2d 503. Thus, an employee may not be discharged for concerted activities to get pay for overtime work, N.L.R.B. v. Schwartz, 5 Cir., 146 F.2d 773, 774; nor for concerted activities in protesting the employment of a cashier whose employment the employees think will affect their earnings, N.L.R.B. v. Phoenix Mutual Life Ins. Co., 7 Cir., 167 F.2d 983 [6 A.L.R.2d 408], nor for demonstrating in protest over the firing of a union president, Carter Carburetor Corp. v. N.L.R.B., 8 Cir., 140 F.2d 714. As said by Judge Duffy in N.L.R.B. v. Phoenix Mutual Life Ins. Co., supra (167 F.2d 988), 'A proper construction is that the employees shall have the right, to engage in concerted activities for their mutual aid or protection even though no union activity be involved, or collective bargaining be contemplated.' "

In N.L.R.B. v. Austin Company, 7 Cir., 165 F.2d 592, 596, it was held that the activity of an employee in initiating a petition to improve working conditions and to propagandize on behalf of a union was protected under the act. In N.L.R.B. v. Schwartz, 5 Cir., 146 F.2d 773 the holding was that the protection extended to one who was organizing a movement to secure pay for overtime work. If these holdings are correct, as we think they are, the protection of the act must certainly be extended to concerted activities entered upon by an employee and a union of which he is a member to secure payment of wages guaranteed by the law of the land. It has been expressly so held. See N.L.R.B. v. Poultrymen's Service Corp., 3 Cir., 138 F.2d 204, 210, 41 N.L.R.B.

444, 463; M. F. A. Milling Co. 26 N.L.R.B. 614, 626, affirmed 8 Cir., 115 F.2d 140.

For the reasons stated, the order of the Board will be enforced.

Order enforced.