## NATIONAL LABOR RELATIONS BOARD

v.

## BRETZ FUEL CO.

No. 6713.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1954.

Decided February 16, 1954.

Robert G. Johnson, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Bernard Dunau, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Earle K. Shawe, Baltimore, Md. (Lacy I. Rice and Rice, Hannis, Rodgers & Steptoe, Martinsburg, W. Va., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The case is before us upon the petition of the National Labor Relations Board (hereinafter called the Board) for the enforcement of the Board's order issued against the Bretz Fuel Company (here-inafter called respondent). The Board, like the Trial Examiner, found that respondent had refused John Bartoletta access to its property to perform his duties as union checkweighman because of his concerted activities and thereby violated Section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. A. § 158(a) (1, 3), (hereinafter called the Act).

The Board's order requires respondent to cease and desist from the unfair labor practices found. Affirmatively, the Board order requires respondent to notify Bartoletta and the Union that respondent has no objection to Bartoletta's employment as union checkweighman, to offer Bartoletta suitable employment if there is no employment available for him as checkweighman, to make whole Bartoletta for any loss of pay he may have suffered as a result of respondent's unfair labor practices, and to post appropriate notices.

In August, 1950, John Bartoletta was employed at respondent's Margaret Mine No. 3. During that month, he was elected by members of Local 9769, United Mine Workers of America, to act as checkweighman at this mine for a period of two years starting September 1, 1950.

As coal was brought from the mine it was weighed and credited to the miner involved before it was dumped into bins to be hauled away. Since the employees were paid in accordance with the tonnage thus recorded, they were permitted, under contract with respondent, to select a checkweighman to check the company weighman. The union checkweighman, whose wages were paid by deductions from the miners' wages, was responsible to and under the direction of the union mine or pit committee, which was composed of three employees selected by the union members and charged with the duty of adjusting disputes under the contract.

In February, 1951, a legislative proposal affecting mine conditions, known as the "Fire Boss" bill, was pending in the West Virginia legislature. Due to the

miners' opposition to the bill, February 23 was designated as a "holiday" under the union contract at respondent's and other mines in order that the miners might protest its passage; respondent Bretz posted a notice that its No. 3 mine would not operate on February 23 and 24.

A fire boss is a safety inspector who enters the mine ahead of the men to ascertain whether the mine is safe for work. The pending legislation would have permitted company foremen to perform these duties in addition to their regular supervisory functions.

On Tuesday, February 20, however, miners in surrounding mines jumped the gun, ceased work in protest over the legislation and began to picket other mines, including respondent's, as a means of getting the employees of these mines to join in the protest. At about 1:30 on that day, near the end of the day shift, 75 or 80 pickets appeared at respondent's mine and advised employees that they were picketing in protest over the Fire Boss bill and that they were closing down the mine.

Bartoletta requested permission of the pickets to weigh the cars of coal which were then on the tipple awaiting weighing and dumping. The pickets refused and Bartoletta thereupon ceased working. The day shift was still in the mine and was not due to come out until 2 p. m. The day shift remained at work in the mine until the shift was completed.

Shortly thereafter, E. P. Boyle, respondent's President, appeared and directed Bartoletta to continue to work and at least to finish weighing the standing coal because of the safety hazard of leaving loaded cars on the tracks overnight. Bartoletta refused to continue. Boyle then asked Bartoletta to go with him to the Mine Committee and the District Representative, but Bartoletta replied that he would not weigh the coal without permission of the pickets no matter who ordered it. Boyle then told Bartoletta that he was "fired" and requested the Mine Committee to appoint another checkweighman to finish the shift. The Committee refused to do so.

A little later, Harry Myers, a representative of District 31 of the Union, arrived and told the pickets that their actions were unauthorized and ordered these actions discontinued. Boyle and Myers then reached an agreement with the pickets that the mine would be shut down the following day, but that the night shift could work and the loaded cars would be hauled back into the mine as a safety precaution. The night shift performed this work. Because of the "holiday", the mine remained closed on February 21, 22, 23 and 24.

On February 23, 1951, the Mine Committee asked Boyle to allow Bartoletta to work. Boyle refused and a grievance was filed but was not processed. On February 26, 1951, all of the men, including Bartoletta, reported for work. Lloyd Feather, the mine foreman, said that there was no work for Bartoletta and that a grievance should be filed. The men refused to return to work without Bartoletta and the mine remained closed until March 15, 1951. Boyle and Feather consistently maintained that a grievance could not be processed until the men returned to work, a position which had been well established by custom in the industry.

On March 1, other mines in the area were picketed, led by Bartoletta, and other miners were forced out on sympathy strikes over the Bartoletta incident. There was evidence of some sabotage to the mine properties.

Meetings were called by the Union District Representatives on March 7 and March 14 and most of the top leadership of the District urged the men to return to work in order to process the Bartoletta grievance. Finally, on March 15, the men returned without Bartoletta and a hearing was had before an impartial arbitrator, E. B. Rowe, on March 20, 1951. At this hearing, in answer to a question by the arbitrator, Boyle stated that he would pay Bartoletta $68 and permit him to return to work. The decision was

then rendered incorporating this agreement on March 20, 1951, with which Boyle complied only to the extent of paying Bartoletta the $68. Following the arbitrator's decision, Boyle stated on several occasions that he would not permit Bartoletta to come back to work and suggested that the employees remove him as checkweighman. On March 21 the mine was not worked due to a Union meeting called for the purpose of considering the removal of Bartoletta as checkweighman. The removal motion was defeated by two votes, and the men then decided that they would present themselves for work the next day, and, if Bartoletta was excluded, they would not work. On the following day, the employees showed up for work but did not go to work because Bartoletta was not present. Boyle finally induced the men to go to work by his threats that if they did not work they would discharge themselves.

In the afternoon of March 21, 1951, Bartoletta appeared at the mine to obtain coal for his personal use. Boyle stated he didn't have any but Bartoletta started to argue with him. Boyle then said: "For God's sake, Johnny, get out of here before someone gets killed," or words to that effect. Bartoletta claimed that this represented a threat to him and that he was "afraid" to come to work the following day. Bartoletta's own testimony rather clearly indicates that his real reason for not returning to work was his anger over the fact that the motion of the Union to remove him as checkweighman was defeated only by the scant margin of two votes.

Thereafter, another checkweighman was selected and work proceeded. On the afternoon of March 22, Bartoletta told various people, (Committeeman Sigley, District Representative Serdich and District President Urbaniak) that he was afraid to go to work. Urbaniak told him to go to work and that if anything happened the Union would straighten the matter out. Bartoletta, however, did not return until March 29, 1951, when Mine Superintendent Brainny told him that he was "washed up" and that the mine would be shut down if he ever showed up for work.

After the Trial Examiner filed an Intermediate Report recommending the reinstatement of John Bartoletta, on November 24, 1952, Boyle addressed a letter to Bartoletta which read as follows:

"To John Bartoletta,
"Masontown, West Virginia

"Dear Mr. Bartoletta:

"The Bretz Fuel Company hereby tenders and offers you employment at their Margaret No. Three Mine, Masontown, West Virginia. You are requested to report for work at 6 o'clock a. m., Wednesday morning, November 26, 1952, or at 6 o'clock a. m. on November 28, 1952, at said Margaret No. Three Mine.

"Your failure to report for work on the 26th of November or the 28th of November, 1952, as herein stipulated, will be taken as a refusal on your part to work for said Bretz Fuel Company and that you do not now desire employment with said Bretz Fuel Company.

"Dated this 24th day of November, 1952.

"Bretz Fuel Company, a corporation
"By John P. Boyle, Pres. (Signed)"

This letter was personally delivered to Bartoletta on November 24, 1952, by Deputy Sheriff R. L. Collins.

On November 26, 1952, Bartoletta appeared at the mine and was offered employment by John Zuccolotto, the mine superintendent. Bartoletta then stated he would talk to his attorney. He never appeared for work, however, and has not shown up at the mine since that date.

Respondent insists that the Act is not applicable here on the ground that Bartoletta was not its employee, since he was selected and paid by the Union. We do not think it necessary to pass on this point. Nor need we stress the contention of the Board that respondent, by failing to comply with the umpire's decision, breached its contract with the Union. Such a breach of contract, if it

existed, might furnish the basis for a civil action. It seems clear that, under the Act, it affords no basis for interposition by the Board.

We think enforcement of the Board's order must be denied and the order must be set aside. We place our decision upon the single ground, which we think is adequate to support our holding, that the activities of Bartoletta and of the roving miners were not concerted activities within the meaning of the Act, and thus fall far without the ambit of protection intended by Congress in passing the Act.

To quote our own Judge Parker, Joanna Cotton Mills Co. v. National Labor Relations Board, 4 Cir., 176 F.2d 749, 752:

"Not all activities in which employees act together are 'concerted activities' within the meaning of the statute, the exact language of which is, 29 U.S.C.A. § 157: 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'

"The words 'concerted activities' are limited in meaning by the words with which they are associated (noscitur a sociis), which have relation to labor organization and collective bargaining, and by the purpose of such 'concerted activities', which is expressly limited by the immediately succeeding language to concerted activities 'for the purpose of collective bargaining or other mutual aid or protection.' "

And, in another case, National Labor Relations Board v. Draper Corporation, 4 Cir., 145 F.2d 199, 202, 203, 156 A.L.R. 989, Judge Parker said:

" * * * we are of opinion that the 'wild cat' strike in which the employees were engaged and for which they were discharged was not such

a concerted activity as falls within the protection of section 7 of the National Labor Relations Act, but a strike in violation of the purposes of the act by a minority group of employees * * *.

"It is perfectly clear not only that the 'wild cat' strike is a particularly harmful and demoralizing form of industrial strife and unrest, the necessary effect of which is to burden and obstruct commerce, but also that it is necessarily destructive of that collective bargaining which it is the purpose of the act to promote."

Our Court and other federal appellate courts have consistently held that concerted activity is protected only where such activity is intimately connected with the employees' immediate employment. Compare Joanna Cotton Mills Co. v. National Labor Relations Board, supra, (where this Court found that the circulation of a petition for the removal of a foreman "had no relation to collective bargaining, hours or conditions of work or any sort of mutual aid or protection"); N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, 683–684, (where the employees' walkout to protest the demotion of a foreman was found to be primarily in the interest of the foreman and not the employees); N. L. R. B. v. Indiana Desk Co., 7 Cir., 149 F.2d 987, 995, (where the Court concluded that "the picketing was not conducted for the purpose of publicizing the strike or any grievance" but to obstruct access to the employer's premises); N. L. R. B. v. American Manufacturing Co., 5 Cir., 203 F.2d 212, (where the employees ceased work in disregard of safety provisions of the union contract); and N. L. R. B. v. Montgomery Ward & Co., Inc., 8 Cir., 157 F.2d 486, (where employees refused to perform necessary work in the course of their employment).

See, also, N. L. R. B. v. Illinois Bell Telephone Co., 7 Cir., 189 F.2d 124, certiorari denied 342 U.S. 885, 72 S.Ct. 173, 96 L.Ed. 663; Western Cartridge Co. v. N. L. R. B., 7 Cir., 139 F.2d 855; Hazel-

Atlas Glass Co. v. N. L. R. B., 4 Cir., 127 F.2d 109; N. L. R. B. v. Brashear Freight Lines, 8 Cir., 119 F.2d 379; Maryland Dry Dock Co. v. N. L. R. B., 4 Cir., 183 F.2d 538.

The Board, itself, has had occasion recently to affirm that in order to be protected, the concerted activity involved should relate to "organizational matters" or be "germane to the employment relationship" between the employees and their employer. Jefferson Standard Broadcasting Co., 94 N.L.R.B. 1507, 1511–1512, aff'd. sub nomine National Labor Relations Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464, 74 S.Ct. 172. In this case the Board held and the Supreme Court agreed that the circulation of notices disparaging the employer was not a protected concerted activity.

Each of the two cases cited by the Board, National Labor Relations Board v. Moss Planing Mill Co., 4 Cir., 206 F.2d 557, and Salt River Valley Water Users' Ass'n v. National Labor Relations Board, 9 Cir., 206 F.2d 325, involved a dispute between employees and *their own* employer over the employer's failure to pay wages due under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. But we think it equally clear that if these same employees had gone on strike to put pressure on Congress to pass a favorable change in the Fair Labor Standards Act, that would be political activity and not protected by the Act, which was designed to protect employees' rights more intimately connected with their immediate employment. We know of no case holding that a wildcat strike designed to put pressure upon the legislature, to pass legislation desired by the Union, is protected by the Act.

The strike, the picketing and the work stoppage on February 20, 1951, were not authorized by the Union. Indeed, Union officials, without success, endeavored to persuade Bartoletta and the miners to call off the strike and go back to work.

Nor did this strike, and the activities therewith connected, have anything to do with either working conditions or relations between respondent and its employees. The Union had asked for February 23, 1951, as a "holiday" so that the miners might protest against the Fire Boss bill. Not only did respondent grant the request, but it went the added mile and also declared February 24 as a holiday. So, in this score, the miners had no grievance against respondent. Nor was there any showing that the respondent's attitude towards the Fire Boss bill was antagonistic to the position of the Union.

The record contains not a shred of evidence that respondent was hostile to the Union or that respondent had ever done anything to discourage membership in the Union. The mine was operating under contract with the Union. It seems that Boyle, in his younger days, had been a member of the Union and held the Union in high esteem.

The Trial Examiner and the Board refer to the fact that the current Union contract did not contain a binding "no strike" clause. It seems to us, however, that any reliance upon this factor is misplaced. Although the absence of a no-strike clause may *relieve a union* from the consequences of a strike or may free employees to cease work at times agreed upon and for authorized and protected purposes, nonetheless an employer and a union are not thereby prevented from disciplining irresponsible and unprotected work stoppages by an employee. This is especially true where an employee leaves his place of work despite requests from his own responsible union officials to continue work in the interests of safety. Failure to allow the disciplining of such an employee does violence to the very foundations of peaceful industrial relations.

The Board did not refer to the following provision of the contract:

"The United Mine Workers of America and the Operators signa-

**398**

tory hereto affirm their intention to maintain the integrity of this contract and to exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike or lockout pending adjustment or adjudication of disputes and grievances in the manner provided in this agreement."

It seems that Bartoletta's unauthorized wildcat stoppage of work was in violation of this section of the contract and may well have accounted for the Union's disavowal of his conduct.

In this connection, reference might be made to an extract from the Report of the Senate Committee on Labor and Education, (S. Rept. 105, 80th Congress, 1st Session, pages 15–17):

"The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operations during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract."

■ Bartoletta was not an employee of the Company, but an employee of the Union itself. This employee of the Union, another employer, working on the Company's property with the Company's permission, walked off of his job to *lead* a work stoppage, although requested to aid in shutting down the mine in a safe manner not only by the Company officials but by the Union officials, the officially designated representatives of the very people who employed him as a checkweighman. We do not think that this conduct was such "concerted activity" as is protected by the Act.

The petition for enforcement of the Board's order is denied and the order is set aside.

Petition for enforcement of order denied. Order set aside.