ROBERTSHAW CONTROLS COMPANY,
ACRO DIVISION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 10985.

United States Court of Appeals
Fourth Circuit.

Argued March 7, 1967.

Decided Nov. 3, 1967.

Francis V. Lowden, Jr., Richmond, Va. (R. Kenneth Wheeler, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on the brief), for petitioner.

Nancy M. Sherman, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John Taylor, Atty., N. L. R. B., on the brief), for respondent.

Before BOREMAN and WINTER, Circuit Judges, and SIMONS, District Judge.

WINTER, Circuit Judge:

Robertshaw Controls Company ("Robertshaw") petitions to review and set aside an order of the Board adjudging it guilty of violations of §§ 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C.A. § 158, in connection with a long-planned, economically determined move of a part of its manufacturing of electrical snap switches from Hillsboro, Ohio, to a new plant, 65 miles away, at Grove City, a suburb of Columbus, Ohio. The §§ 8(a) (1) and 8(a) (3) violations consisted of Robertshaw's cancellation of promised job transfers to eleven employees[1] at Hills-

---

1. Ten of the eleven had been promised a transfer to Grove City, and the cases of these ten were collectively referred to by the trial examiner as the "group violations." The eleventh, Kathleen Lewis, had been promised a transfer from an

boro and the explanation made to these employees when they were advised of the cancellation; another § 8(a)(3) violation was found to have occurred by Robertshaw's refusal to recall from layoff Beulah Wilson, because she refused to sign a request for recall; and the § 8(a)(5) violations, also concluded to be § 8(a)(1) violations, were found to have occurred by Robertshaw's dealing directly with individual employees, by refusing to give a copy of the waiver signed by new employees to the Grievance Committee Chairman and by refusing to negotiate with the union [2] in August, 1965 in regard to transfers. The context in which these alleged violations occurred and the circumstances of each will be more fully stated.

Robertshaw had contemplated a change in production methods for a long time. For this purpose it had constructed a new plant at Grove City. Firm plans to begin the actual move were arrived at by February, 1965 and put into effect on May 1. The change entailed moving a part of Robertshaw's manufacturing operations from the Hillsboro plant to a new factory at Grove City, Ohio. At Hillsboro, the UAW, as a result of an election conducted by the Board, had been certified as the exclusive bargaining agent for the production and maintenance employees, and Robertshaw and the union had bargained and signed a contract on July 13, 1964. The contract, among other provisions established departmental or job classification seniority for purposes of layoff and recall.

Early in 1965, the erection of the new building at Grove City was completed, and Robertshaw moved certain operations which had theretofore been performed in Columbus, Ohio to the new installation. Robertshaw also moved to Grove City a portion of the operation theretofore conducted at Hillsboro, in consequence of which a great many jobs were abolished at Hillsboro. By the middle of May, over one hundred employees had been laid off from the Hillsboro plant.

Several months before the moves to Grove City began, Robertshaw and the union met several times to discuss the mechanics of the imminent selective discharge of so large a number of workers. Both parties knew that unless the existing contract were amended a number of persons holding long company seniority would lose their jobs, while others, more recently hired, would remain. This was so because the contract established craft seniority, i. e., seniority determined by his period of service compared to the service of other employees on the particular operation on which he was engaged and not his relative seniority to other employees engaged in other operations. Robertshaw and the union tentatively agreed upon a "reduction-in-force" formula at variance with the contract—one which would favor employees having greater plant seniority over employees having lesser plant seniority but greater craft seniority, but the provisional suggestion was rejected when submitted to the vote of the union membership. Robertshaw thereafter acted strictly in accordance with the terms of the contract in making layoffs, both as to timing and with respect to individual selection.

While negotiations with the union and some movement of the operations to Grove City were going on, Robertshaw invited all of its Hillsboro personnel to visit the new plant and apply for jobs, if they wished. Many accepted the invitation and by the end of April, 1965, approximately thirty-one filed written requests for employment at Grove City. Robertshaw selected some, apparently those deemed more skilled or otherwise more desirable, and, before May 1, 1965, approximately seven or eight were told the precise dates when they should report for duty at the new location.

On April 28, 1965, the union mailed to the Regional Director of the Ninth Region a document entitled "Motion to

---

operation at Hillsboro which was to be discontinued, to another operation at Hillsboro which was to be retained.

2. United Automobile, Aerospace and Agricultural Implement Workers of America, UAW–AFL–CIO (hereafter "UAW").

Amend Certification," the purpose of which was to bring the fabrication activities at the Grove City plant within both the scope of the 1962 Hillsboro certification and the coverage of the then collective bargaining agreement. This motion was subsequently followed by a formal Petition for Unit Amendment, filed May 10, 1965. Robertshaw received a copy of the letter, dated April 28, and it immediately deferred the hiring at Grove City of any employees from the Hillsboro plant. Instructions already given to the several employees to start work at Grove City were cancelled and they were laid off, pursuant to the Hillsboro contract, in the course of the economic reduction in force.

The complaint alleging unfair labor practices was issued by General Counsel on July 30, 1965, as a result of a charge filed by the union on June 4, 1965. The complaint and the unit amendment petition were consolidated for hearing. The trial examiner, expressing the difficulties of hearing the two proceedings together, found that Robertshaw had engaged in, and was engaging in, certain unfair labor practices, although not all of the unfair labor practices charged, and that the certification to the union should not be extended to the Grove City plant. The union then sought and obtained leave to dismiss the unit amendment petition and, thereafter, the Board reviewed the report of the trial examiner only as to the alleged unfair labor practices. The Board adopted "the findings, conclusions and recommendations of the trial examiner," with the exception that it reversed the trial examiner in every instance in which he had decided that Robertshaw was not guilty of an unfair labor practice.

Before turning to the unfair labor practices specifically found, we take note that the trial examiner found, and his findings were adopted by the Board, that Robertshaw's decision to move its fabrication operations to Grove City rested solely on economic factors, that there was no suggestion that Robertshaw failed in any statutory duty to discuss the move with the union and that, absent agreement on how to arrange things to everyone's satisfaction, Robertshaw faithfully adhered to the terms of the contract in effect. Moreover, Robertshaw was under no obligation to prefer, or even to hire, the Hillsboro employees at the Grove City plant. Had Robertshaw never invited Hillsboro employees to visit the new location and to file applications for employment there, or, having received applications, had Robertshaw rejected them all summarily, there could have been no suggestion of an unfair labor practice.

§§ *8(a) (1) and 8(a) (3) violations in cancelling promised job transfers and statements made in regard thereto*

The trial examiner found that Robertshaw promised work at Grove City to Cliff Fryman, Bessie Shaw, Wendell Thompson, Cordell Hull, Charles Countryman, Lowell Morgan and Richard Cartwright, specifically, and indicated that if required to do so, he would find that a similar promise was made to three others. The trial examiner further found that whatever promises had been made were withdrawn after the union initiated the unit amendment proceeding, and that the sole reason that Robertshaw refused to put these employees to work at Grove City was the union's motion to amend its certificate. The trial examiner deemed that such action at most could be a violation of § 8(a) (3) of the Act, but he concluded that withdrawal of the promises for this reason did not violate that section.

In reversing the examiner, the Board did not disturb the examiner's finding that Robertshaw's "sole motivation for refusing to transfer the employees was the filing of the petition to amend the certification to include the Grove City plant in the union's certification of the unit at Hillsboro." Indeed, the Board stated "We agree with the Trial Examiner that the Respondent's refusal to hire the employees was motivated by the filing of the petition by the Union * *" but the Board concluded that "such re-

fusal constituted a violation of §§ 8(a) (1) and 8(a) (3) of the Act." The Board arrived at this result by referring to a remark made by Robertshaw's personnel manager that "he wasn't going to take the UAW to Grove City with him * * let's not kid ourselves, we are not taking it with us * * *." Reasoning that one of the several factors pertinent to determining whether a new plant constitutes a separate bargaining unit or an accretion to an existing bargaining unit is the extent to which the employer has transferred employees from the existing plant to the new plant,[3] the Board then inferred that the personnel manager had "obviously" had this principle in mind when he made the remark quoted, so that opposition to possible representation by the union at Grove City motivated Robertshaw to rescind the promise of employment at Grove City to ten employees from Hillsboro. As a separate reason for its conclusion, the Board concluded that the ten employees who had been promised employment at Grove City would have obtained such employment if the union had not filed the petition to amend the certification, so that denial to them of such employment for this reason "necessarily tended to discourage their adherence to and activity in the union * *," conduct which the Board concluded was inherently discriminatory.

 Factually and legally, we conclude that the Board's finding of a group violation of §§ 8(a) (1) and 8(a) (3) cannot stand. The only possible evidence of anti-union animus was the statement of Robertshaw's personnel manager to the effect that Robertshaw was not going to take UAW to Grove City. This statement, however, is *de minimus* when compared with the other evidence of record. At Grove City there were two hundred sixty-nine employees when the move to Grove City was complete. Only thirty-one Hillsboro employees evinced any interest in transferring to Grove City, and of this number only ten were selected. Of the ten, six were members of UAW, including the chairman of the Grievance Committee. From these facts the only fair inference that can be drawn is that membership or non-membership in the UAW was not a factor in the selection of employees to be transferred to Grove City. Further, under the principle of accretion relied upon by the Board to find a violation of the Act, the effect of a transfer of six UAW employees from Hillsboro to Grove City would be decidedly insubstantial on any accretion claim.

Our examination of the record satisfies us that, as the trial examiner stated, revocation of the effectiveness of the transfers at the dates that they were to become operative resulted solely from the filing of the motion to amend certification and the difficulties which it presented for Robertshaw:

"The motion to amend certification filed at that moment placed the Company in an impossible position, so far as the hiring of these particular employees was concerned. The tentative arrangement was to pay most of them at a higher hourly rate, consistent with the scale established for all employees in the Columbus area. Moreover, they had been selected on the basis of individual skill and experience, without regard to their departmental seniority rights under the Hillsboro contract. Had the Company not altered its plan of immediate employment for them at Grove City—a decision now called illegal—its action, under the view which the Union was seeking via the Board to impose upon it, would necessarily have constituted a direct violation of the collective-bargaining agreement. More, the hiring would also have amounted to an illegal refusal to bargain in violation of Section 8(a) (5) of the Act, for the agreement to put

3. Haddon Bindery Incorporated, 101 NLRB 1357, 1359 (1952); Bulova Research and Development Laboratories, 110 NLRB 1036, 1039–1041 (1954); Hess Goldsmith & Co., 110 NLRB 1382, 1387 (1954); Radio Corporation of America, 127 NLRB 1563, 1565–1566 (1960); South-East Coal Company, 138 NLRB 562, 563 (1962).

them to work had been reached unilaterally with the employees and without prior consultation with their union."[4]

The record is clear that when Robertshaw received notice of the UAW's first step to amend the certification, it consulted counsel and indefinitely postponed the promised transfers, on the advice of counsel who, undoubtedly, called attention to the legal cross-fire to which Robertshaw would be subjected if it proceeded as it had promised.

■ The decisions in Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed. 2d 827 (1965), and American Shipbldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), persuade us that Robertshaw's reasons for revocation of the transfers prevent such revocation from constituting a violation of either §§ 8(a) (1) or 8(a) (3). In the Darlington case, the closing of a textile mill (without transfer of its operations to a new location) was held by the Board to be a violation of §§ 8(a) (1) and 8(a) (3). The Court, however, held that it was not an unfair labor practice but, because Darlington was part of a com-

mon enterprise which operated a total of twenty-seven mills and it was recognized that a partial closing could be an unfair labor practice if motivated by a purpose to discourage or suppress a union in any of the related plants, the case was remanded for further findings, both as to the employer's intent and what the employer may reasonably have foreseen the effect of the closing to be. For purposes of our case, the significant holding is that the Darlington closing should be treated only as a possible violation of § 8(a) (3), because § 8(a) (1) would not be violated even though the closing would interfere with § 7 rights, unless it could be said that the interference with § 7 rights outweighed the employer's business justification.[5]

■ The American Ship case reaffirmed the rule announced in N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963) and N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) (decided simultaneously with American Ship) that the question of whether an employer has violated § 8(a) (3) normally turns on an employer's motivation. The significant portion of the Court's

4. This finding by the trial examiner is buttressed by his further statement, which we also find supported by the record:

"No less significant is the fact that the record is barren of any meaningful evidence of anti-union animus in the company representatives. Perhaps more important, there is nothing to indicate the Respondent meant this action to discourage union membership in any shape or manner. The very existence of a plausible and reasonable explanation precludes speculation that might be justified in a vacuum."

5. "We think, however, that the Board was correct in treating the closing only under § 8(a) (3). Section 8(a) (1) provides that it is an unfair labor practice for an employer 'to interfere with, restrain, or coerce employees in the exercise of' § 7 rights. Naturally, certain business decisions will, to some degree, interfere with concerted activities by em-

ployees. *But it is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a) (1) is violated.* * * * A violation of § 8(a) (1) alone therefore presupposes an act which is unlawful even absent a discriminatory motive. Whatever may be the limits of § 8(a) (1), some employer decisions are so peculiarly matters of management prerogative that they would never constitute violations of § 8(a) (1), whether or not they involved sound business judgment, unless they also violated § 8(a) (3). Thus it is not questioned in this case that an employer has the right to terminate his business, whatever the impact of such action on concerted activites, if the decision to close is motivated by other than discriminatory reasons. But such action, if discriminatorily motivated, is encompassed within the literal language of § 8(a) (3)." (emphasis supplied) Id., pp. 268–269, 85 S.Ct. pp. 998, 999.

holding is set forth in the margin.[6] Succinctly stated, discriminating conduct is violative of § 8(a) (3) only when it is motivated by an anti-union purpose. The rule has been repeated as stated in the most recent decision, N.L.R.B. v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027, 1034 (1967). There are, of course, some practices "which are inherently so prejudicial to union interests and so devoid of significant economic justification that no specific evidence of intent to discourage union membership or other antiunion animus is required." (American Ship, Id., p. 311, 85 S.Ct. p. 964), an example of which is discharge of union members who violate shop rules when violations by non-union members are not made the subject of disciplinary action. *Great Dane* also establishes that "once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that it was motivated by legitimate objectives since proof of motivation is most accessible to him." Id. at 34, 87 S.Ct. at 1798, 18 L.Ed.2d 1035. Thus, where an employer fails to demonstrate *any* legitimate economic motivation for a clearly discriminatory action, even absent a positive showing of anti-union animus, that invidious animus must be inferred.

■■ The *Darlington* and *American Ship* cases, besides establishing what constitutes a violation of either section, are thus authority for certain rules for judging the interrelationship between alleged §§ 8(a) (1) and 8(a) (3) violations: Any act which violates § 8(a) (3) necessarily violates § 8(a) (1) because a motive to discriminate is essential to a § 8(a) (3) violation, while it is not essential to a § 8(a) (1) violation. Any act which does not violate § 8(a) (3) because no discriminatory motive is demonstrated may still violate § 8(a) (1) because justifiable economic motivation may be insufficient to outweigh interference with § 7 rights, even though it is sufficient to rebut a discriminatory motive under § 8(a) (3).

Applying those tests to the case at bar, it seems clear that Robertshaw's actions violated neither § 8(a) (1) nor § 8(a) (3). There was clearly no demonstrated anti-union animus, and there was sufficient economic justification to negate any discriminatory motive; hence, § 8(a) (3) was not violated. When the economic justification is weighed against the interference with § 7 rights, we agree, as did the trial examiner, that § 8(a) (1) was also not violated.[7]

---

6. "Section 8(a) (3) prohibits discrimination in regard to tenure or other conditions of employment to discourage union membership. Under the words of the statute there must be both discrimination and a resulting discouragement of union membership. It has long been established that a finding of violation under this section will normally turn on the employer's motivation. * * * Thus when the employer discharges a union leader who has broken shop rules, the problem posed is to determine whether the employer has acted purely in disinterested defense of shop discipline or has sought to damage employee organization. It is likely that the discharge will naturally tend to discourage union membership in both cases, because of the loss of union leadership and the employees' suspicion of the employer's true intention. But we have consistently construed the section to leave unscathed a wide range of employer actions taken to serve legitimate business interest in some significant fashion, even though the act committed may tend to discourage union membership. * * * Such a construction of § 8(a) (3) is essential if due protection is to be accorded the employer's right to manage his enterprise. * * *" Id., p. 311, 85 S.Ct. p. 963.

7. The opinion of the court in the *American Ship* case was not a unanimous one. Mr. Justice Goldberg filed a separate concurring opinion, in which the Chief Justice concurred. As to § 8(a) (1) violations, they stated, in agreement with the majority, that " * * * the correct test for determining whether § 8(a) (1) has been violated in cases not involving an employer antiunion motive is whether the business justification for the employer's action outweighs the interfer-

We further disagree with the Board's holding that the statements made to the ten employees whose transfers to Grove City were cancelled in and of themselves constitute a violation of § 8(a) (1). We have already noted the statement of Robertshaw's personnel manager that Robertshaw was not going to take the UAW to Grove City. This same personnel manager variously told some of the affected employees that "* * * the Union had throwed a monkey wrench in the works," that the transfers were cancelled because "some charges had been filed against the Company," and that no employee was going to Grove City "until the thing straightens out." The general manager of Robertshaw told one employee "the God-damned Union, if they keep their nose out of things, management can do something," and that that employee could not transfer to Grove City because the "Union has filed charges against the Company." The general manager also told that same employee a few days later that the employee had "got just exactly what you asked for when the charges were filed against the Company." An unidentified foreman told another employee, "nobody was going up [to Grove City] because of the Union * * *."

■■■ To constitute a § 8(a) (1) violation, standing alone, the statements referred to must constitute an act which is unlawful, even absent a discriminatory motive. Textile Workers Union of America v. Darlington Mfg. Co., supra. The initial statement of the personnel manager unquestionably constitutes antiunion animus, and some of the other statements evidence extreme annoyance and an unfortunate choice of words; but none of the statements, taken alone, or in the circumstances in which they were uttered, contains any explicit or implicit threat or coercion. Though inartfully phrased, the statements convey only the actual fact, namely, that the union's commencement of steps to amend the certification made it impossible for Robertshaw to fulfill the promises it had made at the time that fulfillment was promised. We conclude that the Board's determination that these statements constituted a violation of § 8(a) (1) is one that must be overturned.

Unlike the ten employees that we have been discussing, Kathleen Lewis was not promised a transfer to Grove City. Since she was employed in a phase of the Hillsboro operations about to be moved to Grove City, and since she had not sought a transfer to Grove City, it appeared that she would be discharged. She was recognized as a capable worker and, when a vacancy occurred in one of the Hillsboro operations that would not be moved, Robertshaw's personnel manager offered her an intra-plant transfer. She accepted and she was told a day certain on which to report for her new duties.

■■ It is not disputed that her transfer was also cancelled. According to the personnel manager, it was because the vacancy to which she was to be transferred no longer existed due to lack of

ence with § 7 rights involved," but in disagreement with the majority that "[a] similar test is applicable in § 8(a) (3) cases where no antiunion motive is shown" and that "the tests as to whether an employer's conduct violates § 8(a) (1) or violates § 8(a) (3) without a showing of antiunion motive come down to substantially the same thing * * *." Specifically, in regard to § 8(a) (3), they took issue with the majority's statement that § 8(a) (3) is violated only when practices "are inherently so prejudicial to union interests and so devoid of significant economic justification that no specific evidence of intent to discour-

age union membership or other antiunion animus is required," and said instead that § 8(a) (3) reaches "* * * to all cases in which a significant antiunion effect is foreseeable regardless of the employer's motive." Id., at pp. 339–340, 85 S.Ct. at pp. 978, 979.

Even if the rules declared by the two concurring Justices are applied in the case at bar, the result that there were no violations of §§ 8(a) (1) or 8(a) (3) is reached. We have concluded that § 8(a) (1) was not violated. By the test of the concurring Justices, § 8(a) (3) could not be violated either.

work. According to her, the reason assigned for cancellation of her transfer was "because of the Union." The trial examiner credited Mrs. Lewis, and his findings were adopted by the Board.[8] Robertshaw correctly points out that one of the reasons assigned by the trial examiner for discrediting the personnel manager was partly in error, because one of the anti-union statements allegedly made by the personnel manager was in fact made by someone else. However, our examination of the record does disclose a direct conflict in the version of the incident given by Mrs. Lewis and that of the personnel manager, and we are not so persuaded that the trial examiner's resolution of the issue of credibility is so inconsistent and inherently improbable that we may set it aside. Cf. Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. United Brass Works, 287 F.2d 689, 694 (4 Cir. 1961). The portion of the Board's order which relates to Kathleen Lewis will be enforced.

### § 8(a) (3) violation concerning Beulah Wilson

Beulah Wilson was a drill press operator at Hillsboro, who did not apply for employment at Grove City. She did not have seniority rights in the assembly group at Hillsboro and was, therefore, laid off on May 25, 1965. She was recalled on August 13, and signed a "request for transfer," the purpose of which was to obtain her statement in writing that she would obtain no seniority privileges in the group to which she was temporarily transferred. After twelve days she was again laid off, but, on Sep-

tember 14, she was notified to return to the plant, where the personnel manager offered her additional temporary employment on condition that she sign another "request" form. When she asked to speak to her union stewardess about the matter, the personnel manager refused, asserting, " * * * it's none of their business * * * this is between you and I." The personnel manager told her either to sign the slip or leave, whereupon she left.

The trial examiner found this conduct on the part of the personnel manager a violation of § 8(a) (3), because Mrs. Wilson " * * * was literally attempting to engage in collective bargaining with the employer at that very moment, and Clark [the personnel manager] found the attitude unacceptable to him * * *," and the Board adopted the trial examiner's findings in this regard and ordered reinstatement and back pay.

█ It is not disputed that Mrs. Wilson could not lawfully have been denied employment for presenting a formal grievance through her stewardess. N.L.R.B. v. Bowman Transportation, Inc., 314 F.2d 497, 498 (5 Cir. 1963). Her efforts to consult with her stewardess were likewise protected. N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967);[9] Southern Oxygen Co. v. N.L.R.B., 213 F.2d 738, 741 (4 Cir. 1954); N.L.R.B. v. Moss Planing Mill Co., 206 F.2d 557, 560 (4 Cir. 1953).

Robertshaw seeks to escape the force of these holdings by arguing that, under the contract between it and the UAW, Robertshaw had the right, temporarily, to transfer employees from one seniority

---

8. The trial examiner credited Mrs. Lewis, because he found that the personnel manager who made the statement "because of the Union" had on two other occasions made strongly worded statements indicating anti-union animus and because cancellation of the transfer occurred the same day that the personnel manager got notice of the UAW motion to amend the certification. In regard to the latter, the trial examiner concluded that the motion had no application to Hillsboro and thus could provide no legitimate business reason to cancel the transfer.

9. "Arbitration can function properly only if the grievance procedures leading to it can sift out unmeritorious cases." Id., 385 U.S. p. 438, 87 S.Ct. p. 569. No less can the Board's authority to prevent employers from engaging in unfair labor practices be invoked, if employees are denied the opportunity to report infractions to their representatives.

group to another for a period of thirty days, and that the contract also provided for the processing of grievances, the provisions of which did not require the personnel manager to participate until the Step 3 grievance meeting. Thus, so the argument runs, Robertshaw had the right to transfer Mrs. Wilson, the personnel manager was under no obligation to bargain with Mrs. Wilson, and Mrs. Wilson could not be considered to be "literally attempting to engage in collective bargaining," as the trial examiner and the Board found.

The short answer is that even if Mrs. Wilson may have misunderstood her rights, she did, however, evidence a clear desire to consult with a union stewardess about the effect, if any, of the document presented for her signature on her seniority. Robertshaw did not tell her that it would hold the job open long enough to enable her, outside of her working hours, to obtain the assurances of her stewardess, nor did it offer to put her to work temporarily pending such a consultation. Instead, it refused to give her employment unless she forewent consultation with her representatives and signed the transfer immediately. We think the legal conclusion of the trial examiner, adopted by the Board, followed, and we will enforce the provision of the Board's order relating to Beulah Wilson.

### § 8(a) (5) violations

Violations of § 8(a) (5) were found by the Board to have been committed in several instances, and these were treated also as violations of § 8(a) (1).

Each of the ten employees selected for employment at Grove City was required to sign a waiver, stating that the employee requested that he be laid off prior to less senior employees in his seniority group. There was further representation by the employee that if his request for layoff was granted, he waived any and all seniority rights or privileges granted under the terms of the current labor agreement at the Hillsboro plant for the purpose of the layoff. The UAW was not consulted about the use of the waiver or Robertshaw's desire to have it signed by the employees to be transferred to Grove City.

The trial examiner found that the purpose of the waiver was to protect Robertshaw from the possibility of union charges that it was making layoffs in violation of its contract. Indeed, the record shows that the personnel manager explained the purpose of the form to one of the employees in these terms: " * * * we can't lay you off under the contract until everybody with less seniority than yours is gone. This [the waiver] is simply to protect the Company from any labor charges that a union may make, that you request a layoff and you will be laid off and rehired at Grove City." The Board accepted the trial examiner's finding as to the purpose of the waiver. The trial examiner also found that the waiver related to conditions of employment at Grove City and not at Hillsboro, that Robertshaw had no obligation to bargain in this regard with the Hillsboro representative, and that Robertshaw did not thus violate § 8(a) (5). The Board, however, concluded that the waiver affected seniority rights at the Hillsboro plant and that these rights were " * * * as much a subject of negotiations with the employees' collective-bargaining agent at the time Respondent sought waivers of such rights as they had been at the time of the negotiations for the collective-bargaining contract the previous year." Accordingly, the Board found that Robertshaw, by failing to consult with the union and by dealing directly with Hillsboro employees concerning waivers of seniority rights under the Hillsboro contract violated §§ 8(a) (1) and 8(a) (5) of the Act.

When the union learned that the employees contemplated to be transferred to Grove City had been requested to sign waivers, the union instructed the chairlady of the Grievance Committee to obtain a copy of the form of waiver. She communicated with Robertshaw's personnel manager on May 26 and requested a copy of the waiver. She was

told that the waiver did not concern the union and that "it's none of your business." Consistent with its conclusion that the waiver related to seniority rights at Hillsboro, the Board concluded that Robertshaw violated §§ 8(a) (1) and 8(a) (5) of the Act by refusing to furnish UAW with the form of waiver.

Another violation of these sections was found to have resulted from a refusal to bargain when, in August, 1965, Robertshaw began the expansion of certain assembly operations which had remained at Hillsboro. New employment was thus created, and among the employees hired were those who had been laid off when the Hillsboro fabricating operation was transferred to Grove City. Before the laid off employees were permitted to work they were required to sign a "request" such as that described in the aspect of the case relating to Beulah Wilson (supra, pp. 16–17).

On August 18, 1965, the UAW requested Robertshaw's personnel manager to negotiate with respect to the procedure to be used in the recall of the laid off employees. The request was refused, for the alleged reason that the procedure was already covered in the contract, and, by the terms of the contract, was, therefore, not subject to renegotiation during the life of the contract. Because the Board was of the view that the recall of laid off employees was obviously a bargainable matter, and that the provisions of the contract pertaining to the transfer of employees were not intended to apply to mass layoffs resulting from the relocation of a substantial portion of the plant's operation, the Board concluded that Robertshaw was under a duty to bargain with respect to the recall procedure, and its refusal to do so violated §§ 8(a) (1) and 8(a) (5) of the Act.

 We disagree that Robertshaw's dealing with individual employees about their signing a waiver as a condition precedent to their transfer to Grove City and Robertshaw's refusal to provide the UAW with a copy of the form of waiver constituted violations of the Act. There was no question but that Robertshaw's contract with the UAW contained specific provisions about seniority and restricted Robertshaw to layoffs in compliance with the seniority provisions of the contract. Had Robertshaw undertaken to employ at Grove City persons previously employed by another employer, unquestionably it would have had the right to require such persons to resign their other employment as a condition precedent to employment by Robertshaw. Where the UAW was not certified as the bargaining agent at Grove City, and where its efforts to extend its certification to Grove City had not yet begun, Robertshaw, no less than if the persons to be employed at Grove City were then in the employment of another employer, would have had the right to require such persons to resign their employment at Hillsboro as a condition precedent to employment at Grove City.

This Robertshaw did not do, and the record shows that it adopted the device of the waiver for the commendable purpose of preserving the rights of employees to vacations, insurance and other benefits. Because Robertshaw might have required the proposed transferees to constitute themselves persons unemployed in the labor market as a condition precedent to their employment at Grove City, we see no reason why Robertshaw could not have adopted a less drastic approach, and why Robertshaw should be penalized for attempting to preserve valuable employees' rights. These rights related to the new employment at Grove City, not the old status of the employees at Hillsboro. With the trial examiner, we agree that the waivers did not relate to conditions of employment at Hillsboro, and we decline to enforce the portion of the Board's order stemming from a contrary finding. It follows that, since Robertshaw did not violate §§ 8(a) (1) and 8(a) (5) in requiring waivers it was under no obligation to furnish the UAW with a copy of the form of waiver. The Board's finding and the order relating to this alleged violation will also be set aside.

The last § 8(a) (5) violation related to Robertshaw's refusal to bargain in August, 1965. As we have stated, during that month, Robertshaw began to expand the assembly operations at Hillsboro. It communicated with those employees who were laid off when the fabrications operations were transferred to Grove City, and inquired if they were interested in working on assembly. Those who replied affirmatively were called in and required to sign a form stating that the *employee* had requested to be recalled on a *temporary* transfer basis. The significance of the form lay in the fact that under the terms of the collective-bargaining agreement an employee transferred at Robertshaw's direction was required to be paid at either the rate he was receiving on his old job or the rate on the new job, whichever was higher, but if the transfer was at the employee's request the employee received the lower of the two rates. Moreover, a permanently transferred employee took his seniority with him to his new group, while a temporarily transferred employee did not.

On August 18, UAW's business representative asked Robertshaw's personnel manager to negotiate about the procedure to be used in the recall of laid off employees; the latter refused, claiming that the procedure was established by the existing collective-bargaining agreement. The union representative replied that the recall of employees laid off due to the relocation of part of the plant was a subject not covered by that agreement, and he was told, "we won't negotiate with you on these people. We intend to. recall those who we please. The Union hasn't got to where it can tell us who to hire yet."

An additional fact to be considered is that, on February 2, March 23 and March 25, 1965, at UAW's request, three conferences between company and union representatives were held to discuss the manner in which Hillsboro employees should be selected for layoff. The trial examiner found that layoffs was the sole subject of the discussions, the par-

ties reached a tentative agreement, the agreement was submitted to the union membership, but the union membership at a vote taken on April 7 rejected the proposals. In regard to the August 18 refusal, both the examiner and the Board found that the recall of laid off employees was a bargainable matter, that the provisions of the contract pertaining to the transfer of employees were not drawn to cover mass layoffs resulting from the relocation of a substantial portion of the plant's operations and that, therefore, the refusal to bargain was in violation of §§ 8(a) (1) and 8(a) (5) of the Act.

Robertshaw does not seriously question the Board's conclusion that the recall of laid off employees was a bargainable matter, N.L.R.B. v. Highland Park Mfg. Co., 110 F.2d 632 (4 Cir. 1940), but it seeks to justify its August 18 refusal to bargain on the dual grounds that the existing collective-bargaining agreement which could not be reopened during its term covered the subject, and that it was under no duty to bargain on the manner of recall if that subject had been discussed during negotiations, but not mentioned in the contract. Cf. N.L.R.B. v. Jacobs Mfg. Co., 196 F.2d 680 (2 Cir. 1952). Additionally, Robertshaw asserts that it fulfilled its duty to bargain by its participation in the meetings of February 2, March 23 and March 25, and its agreement with the UAW representatives, subsequently rejected by the UAW membership.

██ We deem none of the defenses asserted by Robertshaw meritorious. Section 8(d) of the Act specifically states that neither party shall be required "to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period * * *." We have examined the terms of the collective-bargaining agreement, and we are satisfied that the Board could fairly interpret that contract not to cover the recall of laid off employees when the layoffs were occasioned by a partial moving of the Hillsboro operations, as distinguished from less extensive layoffs due to a temporary

slackening or cessation of work, and that such terms are, therefore, not "contained in" the contract.[10]

There is no evidence in the record that at the time the original collective-bargaining agreement was negotiated the parties had any discussion concerning extensive disruption of the Hillsboro operations by the partial move to Grove City, or that this possibility was known to the UAW. Indeed, Robertshaw's participation in the meetings of February 2, March 23 and March 25 was recognition that the parties were faced by a situation not within the contemplation of the collective-bargaining agreement signed July 13, 1964, or even one that had been discussed in the negotiations culminating in that contract.[11]

The "Special Agreement", reached as a result of the spring meetings, but rejected by the UAW's members, speaks in terms of "reassignment" rather than "rehiring." Though it prescribed an all-inclusive procedure for intra-plant transfers, it mentions no procedure for recalls. The evidence in regard to the scope of discussions at the February 2, March 23 and March 25 meetings shows also that the principal subject considered was how to accommodate the contractual rights of seniority to intra-plant transfers at Hillsboro in regard to the operations which would continue there, and that only incidentally did the parties touch on contractual rights of seniority should there be an expansion of the remaining Hillsboro operations at some later date. Moreover, the discussions occurred in 1965, after the 1964 contract was in effect, so that the provision in the 1964 contract foreclosing during its term, negotiations as to matters "which could have been raised," irrespective of whether incorporated in the contract, could have no application.

We conclude, therefore, that Robertshaw was under an obligation to bargain with regard to the recall of layoffs when new employment opportunities resulted from an expansion of the Hillsboro operations. Its refusal to bargain was in violation of §§ 8(a) (1) and 8(a) (5) of the Act. The portion of the Board's order relating to these violations will be enforced.

Enforcement granted in part, and denied in part.

---

10. It has been held that where a subject has *not* been discussed at all during negotiations, the employer is under a duty to bargain on the subject later. N.L.R.B. v. Jacobs Mfg. Co., supra. The theory of this decision apparently is that the silence of the contract cannot implicitly "contain" an agreement to disagree on subjects never discussed. Conversely, it has been held that where the matter *has* been discussed during negotiations, but is not set forth in the final contract, there is no duty to bargain. N.L.R.B. Gen. Counsel Rul., No. 1027, 34 L.R.R.M. 1642 (1954). The rationale is that there is an implicit agreement to disagree on the subject. See, Seagle, The Duty of an Employer to Bargain in Postcontract Negotiations, 51 Corn.L.Q.

523 (1966); Wollett, The Duty to Bargain Over the "Unwritten" Terms and Conditions of Employment, 36 Tex.L.Rev. 862 (1958).

11. Lack of evidence that in July, 1964, the Hillsboro move was contemplated by the parties thus also renders inoperative the provision of the 1964 contract that "No issue or matter *which could have been raised* or was raised by either party during negotiations, without regard to whether it is or is not incorporated in this Agreement, shall be a subject for further negotiations during the term of this Agreement * * *." (emphasis supplied) The UAW could not have raised that which it did not know.