NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

RUBBER ROLLS, INC., Respondent.

No. 16471.

United States Court of Appeals Third Circuit.

Argued Sept. 14, 1967.

Decided Dec. 28, 1967.

Abigail Baskir, National Labor Relations Board, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L.

Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Solomon I. Hirsh, Richard S. Rodin, Attorneys, National Labor Relations Board, on the brief), for petitioner.

Leo J. Kelly, Metz, Cook, Hanna & Kelly, Pittsburgh, Pa. (David C. Baldus, Pittsburgh, Pa., on the brief), for respondent.

Before BIGGS, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order that Rubber Rolls, Inc., reinstate Frederick J. Anderson with back pay on the ground that he had been discharged in violation of §§ 8(a) (1) and (3) of the National Labor Relations Act[1] because of his union activities.

The company is a manufacturer of rubber covering and lining for pipes, tanks and fittings. Anderson became its employee in March, 1960, and remained with the company until his discharge on July 13, 1965.

The company had encountered union activities beginning in 1960. Anderson was active at that time in organizing a local of the Teamsters Union as the certified bargaining representative of the employees in the plant and was a member of the union's negotiating team. Initial negotiations with the company broke down, and an unsuccessful strike ensued. After a few months, in May, 1961, the employees asked to be reinstated and the union's representation was terminated. In 1963 the company's plant manager learned that the Teamsters Union was seeking to rekindle interest among the employees when he saw a copy of a letter which the union had sent to the employees. The president of the company called Anderson to his office and warned him that if he had anything to do with this, he was "on his way out". Again, in the latter part of 1964, Anderson was active in an organizing campaign among the production and maintenance employees of the company on behalf of the Molders Union. Another labor organization, the International Rubber Union, contested the Molders Union's petition for certification and defeated it in an election conducted by the Board on April 21, 1965, and was certified as the representative of those employees. During this campaign Anderson was called to the company office and told that he was "on his way out" if the company found that he had anything to do with it.

During the negotiations which ensued between the International Rubber Union and the company, the union called a meeting in May, 1965, at which the employees unanimously authorized the bargaining committee to call a strike if it wished. By the end of June, Anderson, who had joined the union and had participated in the strike vote, became critical because the negotiations were slow and protracted. The company received reports of Anderson's attitude and that he was advocating a strike. At the final negotiating sessions in the beginning of July, 1965, the plant manager and the president of the company remarked that Anderson was a troublemaker, had caused trouble year after year, and inquired what the union's reaction would be if he he was discharged. On July 9, 1965, the day the negotiating parties reached agreement on a collective bargaining contract the company decided to discharge Anderson. This decision was carried into effect on July 13. The plant manager in discharging Anderson told him that it was because

1. Section 8(a) provides:
"It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [section 7 of the Act];

\* \* \* \* \*
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*." 29 U.S.C. § 158.

he did not get along with the men, had refused to talk with the company, had falsified his 1960 employment application and had a poor work record.

At the hearing before the trial examiner the company claimed that Anderson was discharged because he had been derelict in his work, had misstated his income on a loan application, and because it had learned, two years earlier, that he had misstated his physical condition on his employment application. The plant manager testified that the primary reason for Anderson's discharge was his work performance and then went on to say that "the secondary [reason for his discharge] or I don't know the straw that broke my back on this man was when our negotiating committee walked in and said Fred is causing trouble and inciting the thought of strike in the men's minds. My gosh, all the time that I put up with it because of this element of he is a union man and I recognized it. And, this snowballing and accumulation of these little lack of respect on his part for our problems and management's problems on his work. Those are the primary things."

The trial examiner found that the justifications which the company offered for its discharge of Anderson were mere pretexts and that taken separately or as a package they were not the cause of Anderson's discharge. "Each and every one of them was either stale, unimportant, condoned or pure hearsay or speculation. In fact, separately and together, they bear the earmarks of long-forgotten incidents dredged up from the bottom of the barrel as pretexts for the discharge in order to cover up the fact that the actual reason for the discharge of Anderson * * * was the one which 'broke the camel's back,' to wit, his union activities and his protected activity in suggesting a strike in order to hurry up the protracted negotiations * * *. It is quite clear * * * that but for the 'straw' of his union activities, both past and present, Anderson would not have been discharged on July 13, because of any or all of the above alleged derelictions of duty." The Board approved these findings.

If Anderson's most recent conduct could be described accurately as advocating a wildcat strike for which he was discharged, there would be presented the question whether it is protected activity under the Act.[2] The problem is a fundamental one, for it involves the sometimes incompatible policies of conferring on the collective bargaining agent selected by a majority of the employees the exclusive authority to speak for all of them[3] and of permitting employees the right to individual expression over matters affecting their conditions of employment. There enters into this also the realization that there is a practical advantage to a bargaining agent in extreme demands by individual employees which may aid its more moderate poisition, and a distinction has been drawn by some authorities between conduct of an employee which is in antagonism rather than in aid of the bargaining agent's negotiation.[4]

2. Section 7 of the Act provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." 29 U.S.C. § 157.

3. Section 9(a) of the Act provides: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect * * *." 29 U.S.C. § 159(a).

4. NLRB v. R. C. Can Co., 328 F.2d 974 (5 Cir. 1964). See also Cox, The Right to Engage in Concerted Activity, 26 Ind.

In the present case the Board has taken the view, in agreement with the trial examiner, that Anderson's activity in pressing for a strike was protected because he was merely advocating the use of the strike weapon to assist the negotiations for which approval had already been given by the union.

 We need not decide this question, however, because the record supports the Board's order without regard to Anderson's most recent activity regarding a strike. The Board adopted the trial examiner's finding that Anderson was discharged because of his "union activities, both past and present * * *." The evidence fully supports this finding that one of the company's motives for discharging Anderson was his union activity prior to the most recent strike event. Twice because of such activities, first in 1961 as a result of his efforts to organize a local of the Teamsters Union, and again in 1964–65 when he was active on behalf of the Molders Union, Anderson was told by the company that he would be dismissed if he persisted in his activity. The animus against Anderson because of his union activity was openly expressed as an intention to dismiss him if he persisted in what was protected activity. Perhaps even more significant are the explanations which the company gave for his discharge. These the trial examiner held were pretexts and either separately or as an entirety were not the real cause of Anderson's discharge. They were "dredged up" he said, "from the bottom of the barrel * * * to cover up * * the actual reason for the discharge * * *", which was Anderson's union activities "both past and present", but for which he would not have been discharged.

Since Anderson's protected activity was one of the reasons for his discharge, the company violated §§ 8(a)(1) and 8(a)(3).[5]

The order of the Board will be enforced and an appropriate decree may be submitted.

L.J. 319, 332–33 (1951); Getman, The Protection of Economic Pressure by Section 7 of the National Labor Relations Act, 115 U.Pa.L.Rev. 1195, 1242–48 (1967). But see NLRB v. Draper Corp., 145 F.2d 199, 156 A.L.R. 989 (4 Cir. 1944); NLRB v. Sunbeam Lighting Co., Inc., 318 F.2d 661 (7 Cir. 1963); cf. Western Contracting Corp. v. NLRB, 322 F.2d 893 (10 Cir. 1963).

5. NLRB v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 354 (2 Cir. 1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963); N.L.R.B. v. Barberton Plastics Products, Inc., 354 F.2d 66, 68 (6 Cir. 1965); NLRB v. Symons Manufacturing Co., 328 F.2d 835, 837 (7 Cir. 1964). See also Buitoni Foods Corp., 298 F.2d 169, 174 (3 Cir. 1962); NLRB v. G & J Co., Inc., 346 F.2d 960 (3 Cir. 1965).