**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TANNER MOTOR LIVERY, LTD., Respondent.**

**No. 22676.**

United States Court of Appeals Ninth Circuit.

Nov. 19, 1969.

Abigail C. Baskir (argued), NLRB, Los Angeles, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, John E. Nevins, NLRB, Washington, D. C., for appellant.

John O. Hargrove (argued), of Berol, Loughran & Geernaert, San Francisco, Cal., Thomas Harris, J. Albert Woll, Lambert Miller, Washington, D. C., for appellee.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order entered after we had remanded the case to the Board for further proceedings. Initially, the Board found that Tanner had unlawfully discharged two employees for engaging in concerted activities which were protected by the National Labor Relations Act, as amended. See 148 N.L.R.B. 1402 (1964). In NLRB v. Tanner Motor Livery, Ltd., 9 Cir., 1965, 349 F.2d 1, we agreed with the Board that an attempt by two employees, acting in concert, to persuade their employer to hire Negroes was within the protection of section 7 of the Act, 29 U.S.C. § 157. We remanded to the Board for it to consider whether an employer could discharge employees who picket in support of their aims when there is an established collective bargaining representative having a contract with the employer, and the employees do not act or seek to act through that representative.

The Board on remand held that such consideration was neither essential nor necessary. It indicated that

"The employees were not acting in derogation of their established bargaining agent by seeking to eliminate what they deemed to be a morally unconscionable, if not unlawful, condition of employment. In these circumstances, we are unable to find that the Union's status as the employee's exclusive bargaining agent was infringed, imperiled, or otherwise undermined. * * *

"In addition, * * * we must assume that these employees were acting in accord with, and in furtherance of, the lawful position of their bargaining agent. For the Board to find therefore, that the employee's otherwise protected concerted activities herein were rendered unprotected by virtue of an existing collective-bargaining agreement between Union and the Respondent would be offensive to public policy." [Footnotes omitted.]

A dissenter would have dismissed the complaint.

The Board's opinion obfuscates the issue somewhat, but the very troublesome question presented by this case remains: to what extent does section 9(a) (29 U.S.C. § 159(a)) limit or remove the protection afforded employees by section 7? To the answering of this question the Board has contributed nothing but an *ipse dixit*. We therefore deem it our duty further to explore the question.

Section 7 guarantees that employees shall have the right to engage in concerted activities, but section 9(a) expresses a strong Congressional policy for an exclusive bargaining representative selected by the majority of the employees in a bargaining unit. The case is complicated by the racial character of the concerted employee activities. The employees, Abramson and Dorbin, were picketing in support of a highly desirable objective. Nonetheless, this fact should not be permitted, *per se*, to obscure the question. See Getman, The Protection

of Economic Pressure by Section 7 of the National Labor Relations Act, 115 U.Pa. L.Rev. 1195, 1245–46, nn. 199, 200 (1967) (commenting on our prior decision in this case).

## I

■ As we indicated in our first opinion, the desire for nondiscriminatory hiring does relate to terms and conditions of employment. Accordingly, we held that the concerted activities of Abramson and Dorbin in support of this desire would be protected by section 7 if no bargaining representative had been present. NLRB v. Tanner Motor Livery, Ltd., *supra*, 349 F.2d at 4. Our first opinion also noted that section 9(a)'s provision for an exclusive bargaining representative reserves the right of individual employees or groups of employees to deal with the employer regarding "grievances." But we suggested that the desire "for non-discriminatory hiring, while a proper subject for collective bargaining, may not be a proper basis for a grievance." 349 F.2d at 5. The desire relates to a condition of employment affecting the entire bargaining unit; it is not personal to Abramson or Dorbin. *Cf.* Brown v. Sterling Aluminum Products Corp., 8 Cir., 1966, 365 F.2d 651, 656–657. Because it is a proper subject of bargaining between the union and the employer, the union by section 9 (a) has been vested with the task of vindicating the employees' interest. Thus, the chief question presented is, to what extent does this vesting cut off minority employee rights under section 7? Further, what relevance does the existence of a collective bargaining contract have—and is it important that the contract has anti-discrimination provisions? Finally, would employees have to go through the union even in the absence of a specific anti-discrimination clause in the contract?

The leading case in this general area is NLRB v. Draper Corp., 4 Cir., 1944, 145 F.2d 199, 156 A.L.R. 989. There a union had been selected as the employees' bargaining agent and had made a collective bargaining contract with the employer. The contract expired, and a minority group of employees struck to protest delay in renegotiating the contract. The union did not sanction the strike, but neither was there any evidence of a split between the union and the "wildcat" strikers. The company fired the strikers; the Board held that the activity was protected under section 7 and that the discharges were discriminatory. The Fourth Circuit reversed, holding that a minority had "no right to take independent action to interfere with the course of bargaining which is being carried on by the duly authorized bargaining agent chosen by the majority." 145 F.2d at 203.

*Draper* looked for support to a concept of orderly collective bargaining in which the employer dealt with one party, the designated union. The employer was to look to the union for all demands and concerted economic activity supporting those demands. In *Draper* the employees had not formulated separate demands but had engaged in activity which amounted to independent unsolicited support for the union's position.

We have cited and followed *Draper* in situations where a minority struck without authorization from a union which had been designated as the bargaining representative. In NLRB v. Warner Bros. Pictures, Inc., 9 Cir., 1951, 191 F.2d 217, the activity of the discharged strikers actually was in opposition to the position of their union. But in NLRB v. Sunset Minerals, Inc., 9 Cir., 1954, 211 F.2d 224, a minority struck to protest employer practices where the union had been approached and had taken some action. The minority-employee activity had not been authorized by the union but generally supported the union's position. We said that the case involved similar principles, but upheld the discharge of the strikers, on another ground.

We have reached a contrary result where the employees were not represented by a union in Electromec Design & Development Co. v. NLRB, 9 Cir., 1969, 409 F.2d 631, 634, and NLRB v. Globe

Wireless, Ltd., 9 Cir., 1951, 193 F.2d 748. NLRB v. Buzza-Cardozo, 9 Cir., 1953, 205 F.2d 889, follows *Globe Wireless* where union representation of employees was in doubt.[1]

Despite our allegiance to *Draper* the Board asks us to follow the rationale of NLRB v. R. C. Can Co., 5 Cir., 1964, 328 F.2d 974, 978–979. *R. C. Can* accepts the view that where minority activity supports the union's status or position, it is protected by section 7 notwithstanding any lack of union approval. In *R. C. Can* the union was involved in contract negotiations and by a "general consensus" had rejected a walkout. A small group of employees wished to pressure the employer into speeding negotiations and accordingly stopped work to picket two entrances to the employer's plant. A union representative persuaded the men to abandon the picket line, but it was approximately two weeks before the employer took the men back on the job. The court enforced a Board order premised on the illegality of the discharge. The *R. C. Can* opinion reasoned that because the strikers supported the union, the employer did not have to choose between conflicting demands of the union and the employee group. Thus it concluded that the activity was protected. A dissent emphasized that the strike tactics were not sanctioned by a union majority and concluded that the strike constituted unprotected dissident action.[2]

Dictum in NLRB v. Rubber Rolls, Inc., 3 Cir., 1967, 388 F.2d 71, also support the Board. *Rubber Rolls* was decided on other, narrower grounds, but the court recognized as a factor in these cases "that there is a practical advantage to a bargaining agent in extreme demands by individual employees which may aid [the agent's] more moderate position * * *." 388 F.2d at 73.

To summarize, we believe that the Board's current position could be stated as follows: The union itself could bargain about the desire for non-discriminatory hiring. Indeed, it may be an unfair labor practice for it not to represent the employees fairly, which representation includes a requirement that it must neither practice nor tolerate racial discrimination.[3] Thus in this case it must be presumed that the union had adopted a position at least similar to that taken by the two individual employees. Then it must further be assumed that the strikers were acting in furtherance of the union's policies. Section 9(a) does protect majority choice against minority action. But where no interference can possibly be shown, all complaints and economic pressure should not be required to emanate from the bargaining representative. Moreover, the employer should not be allowed to benefit from the union's failure to authorize the particular type of economic action employed by the minority.

---

1. Salt River Valley Water Users' Ass'n v. NLRB, 9 Cir., 1953, 206 F.2d 325, did hold that an employee was protected by section 7 when he circulated a petition, despite the fact that a union represented the employees. The petition, however, sought to confer a power of attorney on the employee to recover by court action or negotiation individual employee claims for back pay and overtime wages. We considered the activity to be the presentation of a grievance within section 9(a).
   Morrison-Knudsen Co. v. NLRB, 9 Cir., 1966, 358 F.2d 411, and NLRB v. Phaostron Instrument & Electronic Co., 9 Cir., 1965, 344 F.2d 855, did not consider the problem we face here. In *Morrison-Knudsen* the record shows that there was a union representing the employees and having a contract with the employers. But the facts show a clear case of a "grievance" (section 9(a)) asserted by a father and son over the son's being required to work under what they believed to be dangerous conditions. In *Phaostron*, the employees were not represented by a union.

2. Subsequent decisions of the Fifth Circuit may undermine the continued validity of *R.C.Can*. See NLRB v. Cactus Petroleum, Inc., 5 Cir., 1966, 355 F.2d 755, 761; *cf.* Southern Conference of Teamsters v. Red Ball Motor Freight, Inc., 5 Cir., 1967, 374 F.2d 932, 937.

3. See Local Union No. 12, United Rubber Workers, etc., v. NLRB, 5 Cir., 1966, 368 F.2d 12; *cf.* Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842. But see NLRB v. Miranda Fuel Co., 2 Cir., 1963, 326 F.2d 172.

In rebuttal Tanner argues that section 9(a) provides that the selected representative shall be the exclusive representative of all employees in the unit. This exclusivity extends not only to bargaining positions but also to types of supporting activity. *Draper* and similar cases recognize that section 9(a) sets up a procedure for collective bargaining in which employee sentiment is aired within the union and expressed in a position adopted by a union majority. The employer can then deal with the union knowing that its position reflects shared objectives of the members. Finally, dissidents have the obligation to go first to the union to win support for their position.

The split between the positions of the parties, and between *R. C. Can* and *Draper,* arises from two disparate views of the union as an institution. The Act does not by its terms select one view over the other, but policies expressed in the Act and Supreme Court decisions applying these policies give us some guidance beyond that provided in *R. C. Can* and *Draper.*

NLRB v. Allis-Chalmers Mfg. Co., 1967, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123, presented a different facet of the interplay between section 7 and 9(a). There a union had called a strike against an employer in support of new contract demands, but some union members crossed picket lines to work during the strike. The union assessed fines of $20 to $100 against the non-strikers. The Seventh Circuit in banc found that the non-strikers' actions were protected by section 7 and accordingly held that assessment of the fines violated section 8(b) (1) (A) of the Act. The Supreme

Court reversed, at least implying that "by joining a union an employee gives up or waives some of his § 7 rights." [4] The opinion of the Court found support for its decision in such interests as not wishing to limit a union's power as the exclusive bargaining agent (388 U.S. at 183–184), leaving certain internal affairs to union self-government (388 U.S. at 186–192, 87 S.Ct. 2001), and recognizing the effect of the Landrum-Griffin amendments in requiring "democratic principles, fair procedures and freedom of speech * * * [in] all aspects of union affairs." (388 U.S. at 195, 87 S.Ct. at 2014.) These same interests support the characterization of a union as "an institution in which employee sentiment can be crystallized and expressed." Getman, *supra*, 115 U.Pa.L.Rev. at 1246.

*Allis-Chalmers* was followed in Scofield v. NLRB, 1969, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385. There some production employees of the Wisconsin Motor Corporation were being paid on a piecework basis. The union representing the employees had by rule imposed a ceiling on the production for which its members could accept piecework pay. Scofield and other employees exceeded the ceiling and were paid by Wisconsin for the excess. The union then imposed fines of $50 to $100 and a year's suspension from the union for violating its rule. The Court's opinion in *Scofield* found the piecework rule to be related to the internal affairs of the union, and accordingly relied on *Allis-Chalmers* and the weight which was given there to requirements for democratic union decision-making processes to uphold the union rule as applied to union members. See 394 U.S. at 429, 89 S.Ct. 1154 & nn. 5, 6.[5]

4. NLRB v. Allis-Chalmers Mfg. Co., 1967, 388 U.S. 199, 200, 87 S.Ct. 2016, 2017, 18 L.Ed.2d 1138 (Black, J., dissenting).

5. Of relevance also are such cases as Glover v. St. Louis-San Francisco Railway Co., 1969, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519, and Vaca v. Sipes, 1967, 386 U.S. 171, 87 S.Ct. 903, which require an individual employee initially to take grievances to the union in the

absence of unusual circumstances. In NLRB v. J. P. Stevens & Co., 4 Cir., 1969, 409 F.2d 1207, employees intervened in a subpoena enforcement action to protest a Board order which directed an employer to supply a union with employee names and addresses. The employees asserted a section 7 right to remain neutral and rights to be left alone during the campaign. The court held that an interest in an informed elec-

In our view, *Allis-Chalmers* in particular recognizes a growing tendency to insure that an individual member's views are aired inside the union. Statutes and decisional law promote free speech [6] and democratic decision-making processes [7] within the union. Decisions like *Allis-Chalmers* and *Scofield* rely on these factors to give weight to a union majority's decision. In *Allis-Chalmers* and *Scofield* the Court opted for concerted *union* activity, and upheld reasonable union sanctions against union members who sought to pursue a contrary course. If the union can expect a modicum of allegiance after a majority has made a decision, then the employer should be entitled to rely on that allegiance in negotiations with the union. The Court was upholding concepts of orderly bargaining which apply from either viewpoint.

Accordingly we reject the rationale of *R. C. Can* and the dictum in *Rubber Rolls. Draper* and our own decisions following *Draper* like NLRB v. Sunset Minerals, Inc., *supra*, seem more in accord with a concept of orderly bargaining premised upon democratic union processes. *Rubber Rolls* does recognize the value of a militant minority to a union. But even under our decision, a minority has some impact. A minority which goes to the union and fails to get majority support for its desires may nonetheless influence the ultimate settlement made by an employer. Where a bargaining unit is made up of groups with diverse interests, the employer, like the union, must take these interests into account in arriving at a compromise which will be ultimately approved by an overall majority of the employees.

The racial aspects of this case emphasize the problem of what action is proper when the intra-union processes produce a majority decision which is outside legally acceptable bounds. It is unnecessary here, and it would be premature, for us to undertake to resolve the problem of whether the minority members would then be entitled to undertake to achieve their lawful objective by dealing with the employer individually.

In sum, we conclude that Tanner's two employees, Abramson and Dorbin, had an obligation to go to the union with their desire for non-discriminatory hiring. The record does not demonstrate that they approached the union, nor does it indicate that the union gave its sanction to their actions. Thus, while their concerted activity does fall within section 7, the operation of section 9(a) deprives it of the protection to which it would otherwise be entitled.

Our decision makes immaterial the presence or absence of an anti-discrimination clause in the collective bargaining contract. Whether Abramson or Dorbin were seeking enforcement of a contract clause or seeking to instigate bargaining over such a clause, they had an obligation first to seek action by a union majority.

## II.

The foregoing conclusions, however, do not end the matter. Abramson was fired on July 29, ostensibly for having one accident on July 24, and another on July 25. All that he had done was first, to ask his supervisor whether he objected to hiring Negroes, to which the answer was no, second, to ask if the supervisor would consider a Negro applicant whom he knew, to which the answer was yes, third, to deny knowledge of a news broadcast criticizing Tanner's hiring policies on racial grounds, and fourth, to speak to Dorbin about that press release. Abramson was then fired. He did not picket until after he had been fired.

All that Dorbin had done was, first, to prepare press releases for a civil rights

---

torate outweighed any inconveniences to the complaining employees.

**6.** See 29 U.S.C. § 411; Linn v. United Plant Guard Workers, Local 114, 1966, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582; Navarro v. Gannon, 2 Cir., 1967, 385 F.2d 512; International Brotherhood of Boilermakers, etc., v. Rafferty, 9 Cir., 1965, 348 F.2d 307.

**7.** See 29 U.S.C. §§ 411, 481, and decisions cited in note 6 *supra*.

organization, second, to tell his superior, after Abramson had spoken to him, that the news broadcast was erroneous and that he had prepared a press release stating that Tanner appeared to be acting in good faith, and third, after Abramson was fired, to picket. Dorbin was then fired.

Thus Abramson was *not* fired for picketing; Dorbin was. Moreover, and more important, the employer's representative, when spoken to by Abramson and later by Dorbin, never expressed any objection to their doing so. Much less did he indicate that Tanner's position was that these were matters that should be presented to it by the union as the recognized bargaining agent, rather than by two or more employees acting independently. The manner in which each was received could well have led Abramson and Dorbin to conclude that the employer felt that what they were doing was proper, and even that it believed that they had a protected right to do it.

We think it arguable that in cases where employees, not acting through the union, initiate in a peaceful and non-disruptive manner an activity which would otherwise be protected under section 7, but is not by reason of section 9(a), the employer has a duty to tell them that the matter must be taken up through the union, and, if the employer does not do so, he has waived his right to object on that ground, so that section 7 becomes fully operative. We do not decide this question; we think it is for the Board to decide in the first instance.

Other questions lurk in this record. Abramson was not fired for picketing; Dorbin was. This raises two questions. The first assumes that there is no duty on the part of the employer to demand that the matter be taken up through the union. If so, and if the action of the employees is and remains peaceful and non-disruptive, is it consistent with the objectives of the Act as embodied in sections 7 and 9(a) to say that the employer cannot fire the employees without first letting them know that he considers their activity ground for discharge if it continues?

The second question assumes a duty of the employer to demand that the matter be taken up through the union, on pain of being held to have waived the protection of section 9(a). See NLRB v. Miller Brewing Co., 9 Cir., 1969, 408 F.2d 12. If so, how far does the "waiver" go? Is it only a waiver of the right to discipline for peaceful and non-disruptive conduct, or does it extend to picketing? If it extends to picketing, is the manner of picketing material?

There is still another question presented by the record. Was the conduct of either of the employees condoned? Tanner reinstated Dorbin on the day following his discharge. Tanner's branch manager called Dorbin and arranged a meeting. During the meeting the manager told Dorbin that his discharge had been a "mistake," and that Dorbin could begin work at his regularly scheduled time. The Board might conclude that Tanner condoned the unprotected, concerted activities in which Dorbin engaged.

The applicable standards of the doctrine of condonation were stated in NLRB v. Marshall Car Wheel & Foundry Co., 5 Cir., 1955, 218 F.2d 409, 414:

"Where, as here, the strike misconduct is clearly shown, condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred."

Compare Confectionery & Tobacco Drivers, etc. v. NLRB, 2 Cir., 1963, 312 F.2d 108, 113 (finding condonation), with Packers Hide Ass'n v. NLRB, 8 Cir., 1966, 360 F.2d 59, 62–63; Plasti-Line, Inc. v. NLRB, 6 Cir., 1960, 278 F.2d 482, 486–487; NLRB v. Marshall Car Wheel & Foundry Co., *supra*, and NLRB v. Warner Bros. Pictures, Inc., *supra*, 191 F.2d at 219 (all finding no

condonation). The Board has not passed on this question.

The Board found that Abramson was fired for engaging in activities supporting non-discriminatory hiring, and not for having had the traffic accidents. Substantial evidence supports this determination. Abramson was never reinstated. But because Abramson and Dorbin were intimately involved in the same activity, the Board might conclude that the employer's assignment of another, fictitious reason for Abramson's discharge should not bar his reinstatement also, under the condonation doctrine. *Cf.* NLRB v. E. W. Buschman Co., 6 Cir., 1967, 380 F.2d 255. The Board has not considered any of these questions.

The Board's order is vacated, and the matter is remanded to the Board for further proceedings consistent with this opinion.