**EASTEX, INCORPORATED,**
**Petitioner-Cross**
**Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**No. 74–4156.**

United States Court of Appeals, Fifth Circuit.

April 7, 1977.

Tom M. Davis, Houston, Tex., for petitioner-cross respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, Paul J. Spielberg, N.L.R.B., Washington, D.C., Louis V. Baldovin, Jr., Regional Director, Region 23, Houston, Tex., for respondent-cross petitioner.

---

Before BROWN, Chief Judge, and RIVES and GEE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case is before the Court upon the petition of Eastex, Incorporated for review and modification of the Board's determination that Eastex violated § 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1)[1] by prohibiting distribution by employees on company premises a union sponsored circular on non-working time in non-working areas. The Board has filed a cross-application for enforcement of the order. We enforce the order.

It is startling, and at the same time a tribute to our adversary system which takes cases as they come with no arrogant assumption that decision-makers—legislative or judicial—can anticipate all that will follow, that in the hundreds of Labor Board cases in this Court, we have never been faced with quite this problem before. Avoiding the time worn, battle weary cliche of the clean slate, we are, in the Astronautical Age, exploring new space, with only limited or hierarchical limitations imposed.

## I.

In March 1974, the President and Executive Board of the Union (United Paper Workers International Union, Local 801) decided to distribute the following news bulletin to employees of Eastex.

### ■ *WE NEED YOU*[2]

As a member, we need you to help build the Union through your support and understanding. Too often members become disinterested and look upon their Union as being something separate from themselves. Nothing could be further from the truth.

---

1. Section 8(a)(1), 29 U.S.C.A. § 158(a)(1) provides in pertinent part: (a) it shall be an unfair labor practice for an employer—

(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 157 [Section 7] of this title.

Section 7, 29 U.S.C.A. § 157 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. * * *"

2. The brackets [1], etc. are inserted for ease of reference.

This Union or any Union will only be as good as the members make it. The policies and practices of this Union are made by the membership—*the active membership*. If this Union has ever missed its target it may be because not enough members made their views known where the final decisions are made—The Union Meeting.

It would be impossible to satisfy everyone with the decisions that are made but the active member has the opportunity to bring the majority around to his way of thinking. This is how a democratic organization works and it's the best system around.

Through participation you can make your voice felt not only in this Local but throughout the International Union.

### A PHONY LABEL—"right to work"

Wages are determined at the bargaining table and the stronger the Union, the better the opportunity for improvements. The "right-to-work" law is simply an attempt to weaken the strength of Unions. The misleading title of "right-to-work" cannot guarantee anyone a job. It simply weakens the negotiating power of Unions by outlawing provisions in contracts for Union shops, agency shops, and modified Union shops. These laws do not improve wages or working conditions but just protect free riders. Free riders are people who take all the benefits of Unions without paying dues. They ride on the dues that members pay to build an organization to protect their rights and improve their way of life. At this time there is a very well organized and financed attempt to place the "right to work" law in our new state constitution. This drive is supported and financed by big business, namely the National Right-To-Work Committee and the National Chamber of Commerce. If their attempt is successful, it will more than pay for itself by weakening Unions and improving the edge business has at the bargaining table. States that have no "right-to-work" law consistently have higher wages and better working conditions. Texas is well known for its weak laws concerning the working class and the "right-to-work" law would only add insult to injury. If you fail to take action against the "right-to-work" law it may well show up in wages negotiated in the future. I urge every member to write their state congressman and senator in protest of the "right-to-work" law being incorporated into the state constitution. Write your state representative and state senator and let the delegate know how you feel.

### POLITICS and INFLATION

The Minimum Wage Bill, HR 7935, was vetoed by President Nixon. The President termed the bill as inflationary. The bill would raise the present $1.60 to $2.00 per hour for most covered workers.

It seems almost unbelievable that the President could term $2.00 per hour as inflationary and at the same time remain silent about oil companies profits ranging from 56% to 280%.

It also seems disturbing, that after the price of gasoline has increased to over 50 cents a gallon, that the fuel crisis is beginning to disappear. If the price of gasoline ever reaches 70 cents a gallon you probably couldn't find a closed filling station or empty pump in the Northern Hemisphere.

Congress is now preceeding with a second minimum wage bill that hopefully the President will sign into law. At $1.60 per hour you could work 40 hours a week, 52 weeks a year and never earn enough money to support a family.

As working men and women we must defeat our enemies and elect our friends. If you haven't registered to vote, please do so today.

### FOOD FOR THOUGHT

In Union there is strength, justice, and moderation;

In disunion, nothing but an alternating humility and insolence.

COMING TOGETHER WAS A BEGIN-NING

STAYING TOGETHER IS PROGRESS

WORKING TOGETHER MEANS SUCCESS

THE PERSON WHO STANDS NEUTRAL, STANDS FOR NOTHING!

On March 26, 1974, Hugh Terry, an Eastex employee and Union vice-president sought permission from George, the assistant personnel director, to hand out the bulletin in non-working areas during non-working time. George's response was that he doubted Eastex would allow the distribution but he would check with higher management. Later, Boyd Young, Union President, and other employees of Eastex raised the matter with George. He again denied permission to distribute the bulletin. Upon consultation with Leonard Menius, Eastex's Personnel Director, George confirmed that Eastex's final position would be to deny permission for distribution of the bulletin.

The Administrative Law Judge found that Eastex maintained no-solicitation and no-posting rules[3] in violation of § 8(a)(1). But it is clear that Rule 14, no-solicitation, played no part in its decision to prohibit distribution of the bulletin. This conclusion is corroborated by Young's testimony that the request was made not because of a contract or rule but to continue good relationship with Eastex.

Eastex took the position that the second and third sections of the bulletin,[4] "[2] A Phony Label—'Right To Work'" and "[3] Politics and Inflation," were purely political and did not pertain to anything over which it had authority or power to change or control. Eastex thus asserts that these sections were not matters related to the exercise of § 7 rights, 29 U.S.C.A. § 157. The Board found that parts [2] and [3] of the bulletin were protected by § 7 and that Eastex had violated § 8(a)(1) of the Act. We agree that the bulletin was protected by § 7 and inescapably it follows that Eastex violated § 8(a)(1) in prohibiting its distribution.

*II.*

Section 7, 29 U.S.C.A. § 157, guarantees to employees the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively * * * and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. * * *" Section 8, 29 U.S.C.A. § 158, condemns as an unfair labor practice interference by an employer in the exercise of those rights.

The pivotal point of this decision rests upon the classification of the activity—was the admittedly concerted activity for the purpose of collective bargaining or other mutual aid or protection, or was it completely outside of the protection of § 7. In essence, we must determine if this bulletin concerned matters relating to the exercise of § 7 rights. If the activity was under the protective umbrella of § 7, the employer committed an unfair labor practice by interfering in the exercise of the right. If it was not, the employer's prohibition on distribution would furnish no basis for a finding of unfair labor practice.

Eastex prohibited distribution of the bulletin because parts [2] and [3] were pure-

---

**3.** Plant Rule 14:

No peddling or soliciting shall be allowed on the premises without permission of the Production Manager. Petitions which are approved by both Management and the Union will be considered for payroll deductions on an individual basis.

Plant Rule 15:

Notices shall not be posted anywhere in the mill except on company designated bulletin boards which are provided for either general notices or union notices. Approval for post-ing any notice, except union notices designating time and place of union meetings, must be obtained from Management. All boards must be kept neat and orderly.

Eastex did not before the Board, or here, challenge the ALJ's order as to the rules.

**4.** Menius, Eastex's Personnel Director, did not object to the distribution of part "[1] We Need You," and part "[4] Food For Thought," of the bulletin. Nor does it on appeal.

ly political and did not pertain to anything over which "Eastex had the authority or power to change or control." We do not accept Eastex's position. Both parts are sufficiently related to employment situations to merit § 7 protection. Although a number of Circuits in a variety of circumstances unlike those here have nominally declared that the test of whether the activity is protected is whether it pertains to something over which the employer has it within his power or authority to change or control,[5] we think that is too narrow.

The fact is that Courts have not been this stringent in the day to day application to the infinite complexities of industrial-collective bargaining life. The horizon of § 7 rights is not confined to the factory wall or the perimeters of the battlefield *vis-a-vis* employer-employees.[6]

Since authorities among (and within) the circuits are not consistent on the point, and the Supreme Court has not yet spoken definitively, we are compelled to offer another view to march in company along the way toward a synthesis.

The synthesis involves, of course, arriving at an accommodation between two sets of rights broadly hostile to each other. One set comprises the rights of the proprietor-employer arising from his ownership and control of the plant premises. Among these is the right to prescribe what those whom he invites on his property shall and shall not do while there. The other set of rights are those granted employees by § 7, rights "to self-organization . . . to bargain collectively . . . and to engage in *other* concerted activities for the purpose of collective bargaining or *other mutual aid or protection.* . . ." 29 U.S.C.A. § 157 (emphasis added).

Whatever the scope of § 7 rights may be when exercised off the employer's property,[7] at the plant gate they enter as a wedge driven in the employer's mass of proprietary ones, and as such, on this terrain they come under especial pressure. Yet it seems clear that they should not be unduly compressed there, since it is only there that the employees assemble in their full capacity as such, with attendant ease of communication with each other and with

---

5. *See NLRB v. Leslie Metal Arts Co., Inc.,* 6 Cir., 1975, 509 F.2d 811, 813 ("Protected activity must in some fashion involve employees' relations with their employer. * * * "); *Shelly & Anderson Furniture Mfg. Co. v. N.L.R.B.,* 9 Cir., 1974, 497 F.2d 1200 (protected activity must seek a specific remedy for a work-related complaint or grievance); *NLRB v. Tanner Motor Livery, Ltd.,* 9 Cir., 1969, 419 F.2d 216 (the mutual aid clause of § 7 "protects concerted activities which have to do with terms and conditions of employment"); *G & W Electric Specialty Co. v. NLRB,* 7 Cir., 1966, 360 F.2d 873 (when the activity of the employee does not involve a request for any action on the part of the company or does not concern a matter over which the company has any control such action is not within the other mutual aid or protection of 29 U.S.C.A. § 157); *NLRB v. Bretz Fuel Co.,* 4 Cir., 1954, 210 F.2d 392, 396 ("Concerted activity is protected only where such activity is intimately connected with the employees' immediate employment").

6. *See Fort Wayne Corrugated Paper Co. v. NLRB,* 7 Cir., 1940, 111 F.2d 869; *accord, Bethlehem Shipbuilding Corp., v. NLRB,* 1 Cir., 1940, 114 F.2d 930, *cert. denied,* 1941, 312 U.S. 710, 61 S.Ct. 448, 85 L.Ed. 1141. In *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.,* 2

Cir., 1942, 130 F.2d 503, cited with approval in *NLRB v. Weingarten, Inc.,* 1975, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 and *Houston Insulation Contractors Assn.,* 1967, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389, this principle was given a more detailed analysis. *See also NLRB v. General Electric Co.,* 9 Cir., 1969, 411 F.2d 750, *aff'g* 169 N.L.R.B. 1101 (1968) (the Ninth Circuit agreed that the protection of § 7 extends to the collection of funds by union members on their employer's property for the striking employees of another unrelated employer); *Signal Oil & Gas Co. v. NLRB,* 9 Cir., 390 F.2d 338; *NLRB v. J. G. Boswell Co.,* 9 Cir., 1943, 136 F.2d 585. Likewise, making of complaints by employees to appropriate government agencies is among the concerted activities protected by the Act. *NLRB v. Shipbuilding Local 22,* 1968, 391 U.S. 418, 424, 88 S.Ct. 1717, 20 L.Ed.2d 706, 712; *Socony Mobil Oil Co., Inc. v. NLRB,* 2 Cir., 1966, 357 F.2d 662, 664; *Walls Mfg. Co. v. NLRB,* 1963, 116 U.S.App.D.C. 140, 321 F.2d 753, *enf'g* 137 N.L.R.B. 1317 (1962), *cert. denied,* 1963, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166.

7. Doubtless there limited only by valid general law of the situs and the First Amendment.

management, and with confrontation of daily problems, subjection to working conditions and discipline, etc. Again and again, accommodation is called for. What is to be the informing principle upon which reaching it proceeds?

The key to determining what § 7 permits employees to *say* inside the gates of the plant does not lie in restricting the scope of Congress' language employed in § 7[8] or in requiring a tone more deferential and a subject matter more restricted than the First Amendment permits. Instead it lies in consulting the purpose for which the employees are invited inside these gates at all.[9] That purpose is to do just one thing: to work at their jobs in that plant. We hold that whatever is reasonably related to the employees' *jobs* or to their status or condition as employees in the plant may be the subject of such handouts as we treat of here, distributed on the plant premises in such a manner as not to interfere with the work, to the full range permitted by § 7's language, valid local laws and the First Amendment. Instead of the rigid employer control formulation, we think the policies of the Act and a synthesis of what courts have done—not always said—require that we adopt this reasonably job related test.

Showing that determination ought not to be compelled by some rigid formulation of the past,[10] the Ninth Circuit's recent decision in *Kaiser Engineers v. NLRB*, 9 Cir., 1976, 538 F.2d 1379, points the way.

In *Kaiser Engineers v. NLRB, supra*, in enforcing the Board's order that Kaiser En-gineers had engaged in unfair labor practices, the Ninth Circuit reasoned that direct control by the company over the matter was not the decisive factor. The finding of unfair labor practice was based on Kaiser Engineers' discharge of a civil engineer for having signed and joined with other employees in a joint letter written to United States legislators stating their opposition to a competitor's application to Immigration Authorities for authorization to import foreign engineers. Kaiser contended that the activity was not "for mutual aid or protection within the meaning of § 7" and that "protected activity under § 7 [was] limited to [an] activity taking place within the employer-employee relationship and relating to the terms and conditions of employment". *Supra* 538 at 1384. The Court, in rejecting this contention, reasoned:

It is true, * * * , that the activity involved no request for action on the part of the company, did not concern a matter over which the company had direct control, and was outside the strict confines of the employment relationship. It is also true, however, that the members of the Civil Engineering Society had a legitimate concern in national immigration policy insofar as it might affect their job security. *Id.* at 1385.

The Court held that:

"[C]oncerted activity of employees, lobbying legislators regarding changes in national policy which affect their job security, can be action taken for 'mutual aid or protection' within the meaning of § 7. * * * *" *Id.*

8. As does the "employer's control" test noted and disapproved.

9. Such a rule of reason was followed by the Supreme Court in the somewhat different context of *Lloyd Corp. v. Tanner*, 1972, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131, and was presaged by the dissent of Mr. Justice White in *Food Employees Local 590 v. Logan Valley Plaza*, 1968, 391 U.S. 308, 337, 88 S.Ct. 1601, 20 L.Ed.2d 603. There in determining public rights to handbill in a shopping center, the Court consulted the purpose for which the public was admitted.

10. In *Shelly & Anderson Furniture Mfg. Co., Inc. v. N.L.R.B.*, 9 Cir., 1974, 497 F.2d 1200, the Ninth Circuit embraced a commentator to declare that for § 7 protection the activity must satisfy these elements:

"(1) there must be a work-related complaint or grievance; (2) the concerted activity must further some group interest; (3) a specific remedy or result must be sought through such activity; and (4) the activity should not be unlawful or otherwise improper. 18B Business Organizations, Kheel, Labor Law § 10.02[3], at 10–21 (1973).

### III.

Before analyzing the challenged parts [2] and [3] some observations are in order. At the outset—although this rubs both ways—the publication was so neutral as to Eastex that it does not even remotely come close to that category [11] of non-protected distributions which attacking the very enterprise to which workers owe their jobs malign, ridicule or attack the management's conduct of the employer's business. Next, and very important, the distribution of the pamphlet was not some guided or unguided hope of finding a captive audience for propaganda on contemporary political issues unrelated to the interests of the workers or the union as their statutory bargaining agent. On the contrary, the evidence is uncontradicted and presumably credited by the ALJ that it was done out of direct, tangible employee-union self interest. Negotiations for renewal of the collective bargaining contract were just a few months away. This prospect called for increased support and solidarity on the part of the workers, and to that end recruitment of more members from those who, under Texas right to work laws, did not have to belong to the union.[12]

In this effort which neither employer nor Court can censor, it is at least reasonable for the union to think that accomplishing these goals would be enhanced by showing first a sensitive concern for workers' interests in contemporary social-economic-political problems and, second, a strong stand on such issues.

### IV.

One can hardly imagine a matter on which organized labor—for its members as well as for non-members for whom the union owes the obligation of good faith bargaining—has a more direct interest than right-to-work laws. If, for example, as frequently recurs, a movement was then under weigh to repeal existing right-to-work laws no one under any § 7 standard could question the right of the workers to inform their fellows as to the necessity for concern and action. To this Eastex counters that with the law already on the books [13] the appeal to use pressure against a prospective constitutional mandate [14] was too remote.

11. *See, e. g., NLRB v. Local 1229, IBEW*, 1953, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195; *Maryland Drydock Co. v. NLRB*, 4 Cir., 1950, 183 F.2d 538.

Although some courts have held that employees are not free to distribute this type of material under the protective shield of § 7, without deciding it, we raise the question: Why should they not, so long as management's proper functions and prerogatives are not interfered with by disobedience or economic pressure? Have not the employees an interest in the prudent conduct of the business (and the consequent preservation of their jobs) sufficient to permit them to *speak* on these matters?

12. Young, the union president stated the reasons for wanting to distribute the pamphlet:

"We were going into negotiations, and . . . we was trying to reorganize our group into a stronger group. We were trying to get members, people that were working there who were nonmembers, and try to motivate or strengthen the conviction of our members, and it was to organize a little." R. 16.

13. In 1947, the Texas Legislature enacted its original right to work law, codified at Tex.Rev. Civ.Stat.Ann. art. 5207a (1971).

In 1955, the following right to work law was enacted:

Section 1. It is hereby declared to be the public policy of the State of Texas that the right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization and that in the exercise of such rights all persons shall be free from threats, force, intimidation or coercion.

Tex.Rev.Civ.Stat.Ann. art. 5154g, § 1 (1971).

14. At the time the Union and employees were attempting to distribute the bulletin, the Texas Legislature had created and the voters approved the establishment of a Constitutional Revision Commission and the convening of the 63rd Legislature as a Constitutional Convention to propose a revised Constitution to the voters of Texas. *See* Tex.Const. art. XVII, § 2. The Constitutional Revision Commission held public hearings on the need for constitutional change and reported its findings and recommendations to the 63rd Legislature which later convened as the Constitutional Convention of 1974. Using the recommendations of the Commission as a starting point, the Convention began the task of revising the state constitution.

The right to work issue was very much alive during the Convention, although it was not a recommendation reported from the Commission. A proposal to place the provision in the

But this again ignores the immediate self interest of workers in Texas—including those in the Texas "open shop" of Eastex. It is one thing to face a statutory scheme which is open to legislative modification or repeal. It is quite another thing to face the prospect that such a scheme will be frozen in a concrete constitutional mandate.

That the suggestion was to appeal to congressmen and senators rather than to members of the constitutional revision convention goes only to the method of exercising the cherished right of petition.

■ Part [2] appeals to the workers with respect to circumstances that involve the effectiveness of the union as an institution. The workers have a real interest in bringing to bear whatever political pressure they might have in order to affect conditions they perceive to be a threat or, vice versa, in their favor. It was within § 7 protection.

### V.

Although a bit more tenuous, we think part [3] "Politics and Inflation", is, likewise, protected. Clearly, a minimum wage law even in a company that has a minimum wage of $3.86 [15] has a great deal of bearing, from an economic standpoint, on employment and wage levels. Minimum wage is a recurring item in annual negotiations between unions and employers. The national minimum wage may very well have a direct bearing on skilled labor beyond those covered under the minimum wage act. We need not rely on what we in our non-judicial lives observe in the continuous escalation of wage rates with successful arguments that for each level of employment the minimum has to exceed the federal statutory minimum. For here the Board, adopting ALJ has, in its expertise declared that the "minimum wage inevitably influences wage levels derived from collective bargaining, even those far above the minimum". R. 115.

### VI.

■ Although holding that this literature was protected, we feel compelled to reject outright the Board's second argument. The Board would have us hold that once a protected activity is found then any material that is neutral would be permissible. The material must be reasonably related to employment activities, and the presence of some § 7 protected material will not rescue that which is significantly not protected.

■ We must also reject the Board's argument that the least Eastex could have done was to excise the objectionable portions of the bulletin and permit the distribution of the unobjectionable portion. Requiring this of the employer would inevitably place it in the position of editing the proposals of the union and employees. To allow this would give rise to some very dangerous things. The union could not fully express its views in its own way. The strength of the bargaining process would be seriously diluted. We not only think the employer does not have the duty to edit union material, we also would regard it as an impermissible activity on the part of the

state constitution had been submitted to the Convention by its General Provisions Committee. *See* General Provisions Official Comm. Report art. X, Tex.Const'l Convention (1974); Preliminary Proposals of the Tex.Const'l Convention of 1974 art. X, § 22 (April 6, 1974). This provision, which would have been submitted to the voters as a separate proposal, was a "highly-charged emotional" issue on and off the convention floor. The possibility that right to work would achieve constitutional standing invoked the concern and interest of organized labor. The Convention failed to adopt the proposed constitution and thus it was never submitted to the voters. In the opinion of one commentator, "[I]f nobody had ever mentioned right to work . . . the

convention would probably have adopted a constitution". See Braden, Citizens' Guide To The Proposed New Texas Constitution 60 (1975). This statement accentuates the degree of controversy generated by this issue.

As an additional historical point, it should be pointed out that the 64th Legislature in 1975, in an effort to salvage the labors of the Commission and the Convention of 1974, avoided the right to work issue. The proposed constitution that was put to the voters on November 4, 1975 did not contain a right to work measure. However, the constitution was rejected.

**15.** Boyd Young testified that the minimum wage rate at Eastex as of April 22, 1974 was $3.86 an hour.

employer to undertake such efforts, fraught as they would be with a new charge of §§ 7, 8 violations and a court sanctioned interference with First Amendment rights. *See NLRB v. Magnavox Co.*, Tenn., 1974, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358.

As Eastex does not here question the Board's order on the distribution-solicitation rules (see note 3, *supra*) we make no comment thereon.

ENFORCEMENT GRANTED.